**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD**

SANDRA BLANKENSHIP, KIERSTEIN LESTER, TSHONIA TOLLIVER, DAKOTA BLANKENSHIP, KATHY VANOVER, SHEILA HUNLEY, RHONDA FINLEY, POLLY BLANKENSHIP, LYNN COMBS, ROSA JENKINS, MARGO HILTON, JO ANN DAY, LOIS CLAPSADDLE, BEVERLY SLAGLE, CHRISTINE SCHRADER, REBECCA MULLINS, CHRISTINE GILLIAM, and LISA GAMBILL,

Plaintiffs,

1:26-cv-00520

v.

TAISHAN COAL LLC, and
TAISHAN RESOURCES LLC,

Defendants.

## <u>COMPLAINT</u>

Plaintiffs Sandra Blankenship, Kierstein Lester, Tshonia Tolliver, Dakota Blankenship, Kathy Vanover, Sheila Hunley, Rhonda Finley, Polly Blankenship, Lynn Combs, Rosa Jenkins, Margo Hilton, Jo Ann Day, Lois Clapsaddle, Beverly Slagle, Christine Schrader, Rebecca Mullins, Christine Gilliam, and Lisa Gambill (collectively, "Plaintiffs") bring this action against Taishan Coal LLC and Taishan Resources LLC (collectively, "Taishan" or "Defendants"). In support, Plaintiffs respectfully state as follows:

## STATEMENT OF THE CASE

1. Plaintiffs are 18 residents of Gary, West Virginia, who rely on the Gary municipal water system to get their drinking water. For years now, Plaintiffs have not been able to use the

water from their tap because the water is contaminated with constituents from a nearby surface coal mining operation.

2. Specifically, Plaintiffs' water is black or brown, full of sediment, and has a strong odor. It is not suitable for drinking, cooking, or bathing. Not only does this diminish the use and enjoyment of Plaintiffs' property, but it decreases its value.

3. For years, Plaintiffs have had to use bottled water instead of their tap water for drinking and cooking. However, they cannot avoid the water entirely—they bathe in it when they must, and they have to use it in their dishwashers and laundry machines. This corrodes appliances and stains clothes. Because of this, Plaintiffs are forced to spend money they otherwise would not have to spend if their water was clean.

4. Taishan is to blame for this contamination. It operates a surface mine on the same site as the sole well supplying water to these Gary residents, and it has allowed its mining waste to enter the groundwater and the City of Gary well and wellhouse.

5. Plaintiffs have lived too long without being able to use the water from their tap, and they now file this lawsuit against Taishan under the Surface Mining Reclamation and Control Act ("SMCRA"), the Resource Conservation and Recovery Act ("RCRA"), and common law principles for damages they have incurred to their person or property and to compel Taishan to comply with SMCRA's mandatory water replacement provisions and otherwise provide replacement water to Plaintiffs as a remedy for its negligent and outrageous conduct.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the SMCRA and RCRA citizen suit claims pursuant to 28 U.S.C. § 1331 (federal question), 30 U.S.C. § 1270(a)(1) (SMCRA citizen suit provision), and 42 U.S.C. § 6972(a)(1) (RCRA citizen suit provision).

a. On June 3, 2026, Plaintiffs mailed notice of the violations and their intent to file suit in letters addressed to the Defendants and their registered agents, the United States Environmental Protection Agency ("EPA"), the Office of Surface Mining Reclamation and Enforcement ("OSMRE"), and the West Virginia Department of Environmental Protection ("WVDEP"), as required by Section 520(b)(1)(A) of SMCRA, 30 U.S.C. § 1270 (b)(1)(A), and Section 7002(b)(1)(A) of RCRA, 42 U.S.C. § 6972(b)(1)(A).

b. More than sixty days have passed since notice was served. EPA, OSMRE, and/or WVDEP have not commenced or diligently prosecuted a civil or criminal action to require compliance with SMCRA or RCRA.

c. Moreover, neither EPA nor WVDEP commenced an administrative penalty action under RCRA, 42 U.S.C. § 6972(b)(2)(B)–(C), or comparable state law to redress the violations prior to the issuance of the notice letter.

7. This Court also has jurisdiction over Plaintiffs' SMCRA damages and water replacement claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction). *See Molinary v. Powell Mountain Coal Co.*, 125 F.3d 231, 236 (4th Cir. 1997) ("[O]nce the Secretary approves a state surface coal mining and reclamation program, the rules, regulations, orders, and permits issued under that program are "issued," in the language of § 520(f), 'pursuant to' SMCRA."); *Ohio Valley Env't Coal., Inc. v. Apogee Coal Co., LLC*, 531 F. Supp. 2d 747, 763–64 (S.D. W. Va.

2008) ("What *Bragg* did not do, and could not do, was disturb the clear holding of *Molinary* that distinguished between regulatory and adjudicatory jurisdiction. The *Bragg* panel did not hold that federal courts had no jurisdiction in a primacy state, only that the jurisdiction conferred by § 1270 was necessarily limited by the 11th Amendment to the Constitution."); *see also* W. Va. Code § 22-3-25(f) and 30 U.S.C. § 1270(f) (both creating a cause of action for property damages from surface coal mining operations); W. Va. Code § 22-3-24(e) (creating a cause of action for water replacement).

8. This Court also has jurisdiction over Plaintiffs' common law claims pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction) because it is based on the same set of facts and is so related to the RCRA and WVSMCRA claims that they form the same case or controversy under Article III, it does not raise a novel or complex issue of State law, the claim does not substantially predominate over the RCRA and/or WVSMCRA claims, and there are no compelling reasons for declining jurisdiction.

9. Taishan is subject to this Court's personal jurisdiction because the actions that caused the harm complained of occurred in this District.

10. Venue is proper in this District under 28 U.S.C. § 1391(b)-(d) because Defendants are deemed to reside in any judicial district in which they are subject to personal jurisdiction when the action is commenced and the Defendants' contacts with this District are sufficient to subject them to personal jurisdiction. Venue is also proper pursuant to 30 U.S.C. § 1270(f), which states that a SMCRA statutory action for damages may only be brought in the judicial district in which the coal surface coal mining operation complained of is located. The Taishan coal mining operation is located in McDowell County, which is in this District and Division.

**PARTIES**

11. Plaintiffs are residents of Gary, West Virginia, who own or rent properties located near Taishan's surface mine site and are served by the Gary public water system, which has been contaminated by Taishan's mining.

12. At all relevant times, Plaintiffs were and are "persons" as that term is defined by SMCRA, 30 U.S.C. § 1291(19), and RCRA, 42 U.S.C. § 6903(15).

13. Defendant Taishan Coal LLC is a Delaware limited liability company headquartered in Gary, WV. Upon information and belief, Taishan Coal is a citizen of Delaware and West Virginia. Taishan Coal's designated office, principal office, and principal office mailing address in the West Virginia Secretary of State database is PO Box 81, Gary, WV 24836.

14. Defendant Taishan Resources LLC is a West Virginia limited liability company headquartered in Wilcoe, WV. Upon information and belief, Taishan Resources is a citizen of West Virginia. Taishan Resources' designated office address, notice of process address, and principal office address in the West Virginia Secretary of State database is 7318 Black Diamond Hwy, Wilcoe, WV 24895. Taishan Resources' principal office mailing address in that database is PO Box 81, Gary WV, 24836—the same address as Taishan Coal's designated office, principal office, and principal office mailing address. Taishan Resources is also listed as the notice of process agent for Taishan Coal and the address for that notice of process is listed as Taishan Coal's designated office, principal office, and principal office mailing address.

15. Taishan Coal and Taishan Resources are "persons" within the meaning of that term as defined by SMCRA, 30 U.S.C. § 1362(5), and RCRA, 42 U.S.C. § 6903(15).

## STATUTORY AND REGULATORY FRAMEWORK

### *SMCRA and WVSMCRA*

16. "Congress enacted SMCRA in 1977 to 'establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations.'" *Molinary v. Powell Mountain Coal Co.*, 125 F.3d 231, 234 (4th Cir. 1997) (quoting 30 U.S.C. § 1202(a).).

17. As Congress found when it passed SMCRA, "many surface mining operations result in disturbances of surface areas that burden and adversely affect . . . the public welfare . . . by polluting the water, by destroying fish and wildlife habitats, by impairing natural beauty, by damaging the property of citizens, [and] by creating hazards dangerous to life and property by degrading the quality of life in local communities." 30 U.S.C. § 1201(c).

18. "To achieve its goals, SMCRA relies on 'a program of cooperative federalism that allows States, within limits established by federal minimum standards, to enact and administer their own regulatory programs, structured to meet their own particular needs.'" *Molinary*, 125 F.3d at 234 (quoting *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 289 (1981)).

19. "Any state 'wish[ing] to assume exclusive jurisdiction over the regulation of surface coal mining and reclamation operations' on nonfederal lands within its borders must submit a proposed program to the Secretary for approval. 30 U.S.C. § 1253(a). A state program must include a permitting system that incorporates SMCRA's environmental protection standards and is in accordance with SMCRA's enforcement and procedural requirements. *See id.* If a state covered by SMCRA fails to propose or implement a satisfactory program, SMCRA requires the Secretary to promulgate and implement a federal regulatory program for that state. *See* 30 U.S.C. § 1254." *Molinary*, 125 F.3d at 234.

20. However, states wishing to assume exclusive jurisdiction must adopt a state program at least as stringent as the federal SMCRA program. *See Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 288 (4th Cir. 2001) ("Congress established in SMCRA 'minimum national standards' for regulating surface coal mining and encouraged the States, through an offer of exclusive regulatory jurisdiction, to enact their own laws incorporating these minimum standards, as well as any more stringent, but not inconsistent, standards that they might choose. *See* Legislative History, at 167, reprinted in 1977 U.S.C.C.A.N. at 698; 30 U.S.C. § 1255(b).").

21. "West Virginia submitted a program to the Secretary in 1980 for approval, and the Secretary approved the program in 1981, thus granting West Virginia 'primacy' status—a status under which its law exclusively regulates coal mining in the State. *See* 30 C.F.R. § 948.10 (noting the Secretary's approval of West Virginia's plan). As part of this program, the West Virginia legislature enacted its own statute entitled the 'Surface Coal Mining and Reclamation Act' (the 'West Virginia Coal Mining Act')." *Bragg*, 248 F.3d at 289. This is "WVSMCRA." *See* W. Va. Code § 22-3-1 *et seq*.; W. Va. Code St. R. § 38-2-1 *et seq*.

22. WVSMCRA provisions control. SMCRA provisions "are not directly operable in a primacy state" like West Virginia. *Ohio Valley Env't Coal., Inc. v. Apogee Coal Co., LLC*, 531 F. Supp. 2d 747, 764 (S.D.W. Va. 2008). However, WVSMCRA provisions must still be as stringent as SMCRA provisions.

23. However, "once the Secretary approves a state surface coal mining and reclamation program, the rules, regulations, orders, and permits issued under that program are "issued," in the language of § 520(f), 'pursuant to' SMCRA." *See Molinary*, 125 F.3d at 236.

24. Further, while "'exclusive regulatory jurisdiction' was granted to the states 'over the regulation of surface coal mining and reclamation operations' . . . , '[e]xclusive regulatory

jurisdiction simply does not encompass exclusive adjudicatory jurisdiction.'" *Apogee Coal Co., LLC*, 531 F. Supp. 2d at 762 (quoting *Molinary*, 125 F.3d at 236).

25. Thus, Plaintiffs may nonetheless sue over WVSMCRA violations in federal court to the extent such claims are not foreclosed by the 11th Amendment. *Apogee Coal Co., LLC*, 531 F. Supp. 2d at 763–64 ("What *Bragg* did not do, and could not do, was disturb the clear holding of Molinary that distinguished between regulatory and adjudicatory jurisdiction. The *Bragg* panel did not hold that federal courts had no jurisdiction in a primacy state, only that the jurisdiction conferred by § 1270 was necessarily limited by the 11th Amendment to the Constitution."); *id*. at 764 ("Plaintiffs must be allowed to pursue their claim [in federal court] based on violations of state regulations passed pursuant to SMCRA.").

26. SMCRA provides authority for citizens to sue "any. . . person who is alleged to be in violation of any rule, regulation, order or permit." 30 U.S.C. § 1270(a)(1). A citizen suit under SMCRA may be brought to compel compliance with the act. *Id.* § 1270. Pursuant to 30 U.S.C. § 1270(d), the court may award the costs of litigation, including attorney and expert witness fees to any party whenever the court determines such an award is appropriate.

27. WVSMCRA also creates a separate cause of action for water replacement under the Act. *See* W. Va. Code § 22-3-24 ("(b) Any operator shall replace the water supply of an owner of interest in real property who obtains all or part of the owner's supply of water for domestic, agricultural, industrial or other legitimate use from an underground or surface source where the supply has been affected by contamination, diminution or interruption proximately caused by the surface mining operation, unless waived by the owner. . . . (e) An owner aggrieved under the provisions of subsections (b), (c) or (d) of this section may seek relief in court . . . .").

28. SMCRA and WVSMCRA also allow persons to sue for damages caused by surface mining operations if they can prove such damages were caused by a surface operators violation of a rule, order, or permit. *See* 30 U.S.C. § 1270(f) ("Any person who is injured in his person or property through the violation by any operator of any rule, regulation, order, or permit issued pursuant to this chapter may bring an action for damages (including reasonable attorney and expert witness fees) only in the judicial district in which the surface coal mining operation complained of is located."); W. Va. Code § 22-3-25(f) ("Any person or property who is injured through the violation by any operator of any rule, order or permit issued pursuant to this article may bring an action for damages, including reasonable attorney and expert witness fees, in any court of competent jurisdiction."). The court may also award litigation costs and attorney fees if a person prevails in their suit for damages. *Id.*

***RCRA***

29. The Resource Conservation and Recovery Act ("RCRA") is designed to "promote the protection of health and the environment," 42 U.S.C. § 6902(a), by regulating "the treatment, storage, and disposal of solid and hazardous waste," *Chicago v. Env't Def. Fund*, 511 U.S. 328, 331–32 (1994).

30. A civil action may be brought against "any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective" under RCRA. 42 U.S.C. § 6972(a)(1)(A). RCRA prohibits "any solid waste management practice or disposal of solid waste . . . which constitutes the open dumping of solid waste." *Id.* § 6945(a).

31. RCRA defines "open dump" as "any facility or site where solid waste is disposed of which is not a sanitary landfill which meets the criteria promulgated under section 6944 of this

title and which is not a facility for disposal of hazardous waste." *Id.* § 6903(14); *see also Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1012 (11th Cir. 2004) (to prove an open dump, must show (1) solid waste, (2) is disposed at the site, (3) that the site does not qualify as a landfill under § 6944, and (4) that the site does not qualify as a facility for the disposal of hazardous waste).

32. EPA also promulgated criteria to clarify what practices may violate RCRA's open dumping prohibition. 40 C.F.R. pt. 257; *see also South Road Assocs. v. IBM Corp.*, 216 F.3d 251, 256 (2d Cir. 2000).

33. RCRA defines "solid waste" to mean "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities." 42 U.S.C. § 6903(27).

34. RCRA's statutory definition of "disposal"—explicitly applicable to both solid waste and hazardous waste—is "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

35. In a suit under Section 7002 to abate an open dump, the court "may award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or substantially prevailing party, whenever the court determines such an award is appropriate." 42 U.S.C. § 6972(e).

# FACTS

## *Taishan's Operations in Gary, WV*

36. Taishan owns and operates a 900-acre surface mine site for metallurgical coal and rare earth mineral mining in McDowell County, West Virginia, in and adjacent to Gary, West Virginia. *See* Figure 1 below.




*Figure 1*[1]

37. Taishan's site contains a mine waste impoundment, and that "impoundment is being actively re-mined to extract rare earth minerals and other substances." PSC Decision at 13.[2]

---

[1] *See* Exhibit A for the full size PDF of the map.

[2] On April 20, 2026, the PSC's Deputy Chief Administrative Law Judge ("ALJ") Matthew J. Minney issued a 16-page Recommended Decision to the PSC regarding the Gary water crisis. This will be referred to as the "PSC Decision" for simplicity. The PSC decision is attached as Exhibit B.

Specifically, Taishan is "digging up the previously placed refuse and slurry[] for further processing to recover metals and other materials." PSC Report at pg. 5.[3]

38. Taishan Coal LLC's sole member is Taishan Resources LLC. Taishan Resources is funded by the Chinese company Shandong Weijiao Group International Trading Co., Ltd. Shandong Weijiao Group is the sole member of, and thus the owner of, Taishan Resources.

39. According to Taishan's website, the coal, minerals, or materials mined at this site are not used in the United States—rather, they are sold to China, India, Japan, South Korea, and Vietnam.[4]

40. Taishan Coal LLC has an Article III SMCRA permit—O002084—for its mining activities.

41. Taishan has a long history of violating its O002084 mining permit, facing numerous Cessation Orders, as well as Notices of Violation ("NOVs") numbered up to 116 as of July 2026. For brevity, included is a timeline of particularly relevant events over the past few years:

a. On July 31, 2024, WVDEP issued NOV 101 to Taishan. That NOV "was issued since the Permittee failed to maintain sediment control structure when the sediment accumulation exceeded 60% of the design capacity of Pond 15." As seen in Figure 1 and Exhibit A, Pond 15 is above GW-1 and Outlet 001 on Grapevine Branch and very near or

---

[3] On February 6, 2026, the WV Public Service Commission ("PSC") released a public report regarding the City of Gary's water system and whether it qualified as a distressed utility. That report included a Final Engineering Memorandum authored by Brandon Crace, Technical Analyst Associate in the Engineering Division. This Memorandum will be referred to as the "PSC Report" throughout the Complaint. The PSC Report is attached as Exhibit C. The PSC Report also noted other problems with the Gary water system not attributable to Taishan, such as a failing pipe system and poor upkeep.

[4] Taishan Resources LLC, *Overview*, http://www.taishanresourcesus.com/Pro.aspx?ClassID=38#:~:text=Our%20coal%20can%20be%20used,port%20for%20export%20to%20customers./ (last accessed Apr. 2, 2026).

immediately adjacent to the sole water source for City of Gary. This pond was not fully cleaned, abating the NOV, until October 25, 2024.

b. On the same date as NOV 101, July 31, 2024, WVDEP also issued NOV 102 for failure "to submit annual certifications on all sediment control structures and refuse piles."

c. On October 30, 2024, Taishan and WVDEP entered into a consent order to address outstanding violations of its mining permit, including NOV 102, and problems identified during a July 31 inspection. The Consent Order required Taishan to do the following:

i. "Continue to diligently work on placing refuse, sloping regrade, rip rap groin ditches along Refuse Disposal Site #2 per the approved plan";

ii. "Haul and place topsoil as contemporaneously as possible on finished slopes";

iii. "Maintain drainage structures and provide certifications per the approved plan";

iv. "[R]evise the drainage plan";

v. "[M]aintain a Cat 326 excavator, Volvo 3000 long boom excavator, John Deer 750K dozer, John Deer [sic] 350D truck, John Deer [sic] 350E truck, Sany 500H excavator, Volvo EC480 excavator, John Deer [sic] 950K dozer, two Volvo A30G trucks and a John Deer [sic] 410P truck on site until all remedial measures are completed for NOV 102. There shall be four contractors and five employees dedicated to completing the remedial work required for NOV 102";

vi. "[C]omplete certifications for Pond 4, Pond 5, Pond 6, SM-1, SM-2, SM-3, Pond 11, Pond 12, and Sediment Ditch #1 by November 14, 2024";

vii. "[I]mmediately finish cleaning Pond 3, Pond 13 and internal cells along perimeter ditch #5 at Refuse Disposal #3 to design capacity and certify upon completion but no later than November 28, 2024";

viii. "On before November 28, 2024 Taishan Coal, LLC, shall begin work on Pond 2, and second lift from the bottom of Refuse Disposal Site #2, including placement of refuse and topsoil to be in compliance with contemporaneous reclamation standards"; and

ix. "Within 90 days of execution of this Order, Taishan Coal, LLC shall have completed all maintenance of Pond 3, Pond 13, Pond 2 and internal sediment ditches along perimeter of ditch #5 at Refuse Disposal #3 and provide certifications to the DEP; and have completed the placement of refuse and topsoil to be in compliance with contemporaneous reclamation standards on the second lift from the bottom of Refuse Disposal Site #2."

d. On February 18, 2025, WVDEP issued an imminent harm cessation order to Taishan for its "failure to protect offsite areas" by allowing "black water to leave their permit [from Pond #1] and enter the Wilcoe community," including the Tug Fork River. WVDEP ordered Taishan to "[c]ease all mining activity" and to "[s]top all black water from leaving permit" and into the Tug Fork River and "do all necessary [to] clean up to the stream, community[,] and all affected areas."

e. On July 14, 2025, WVDEP issued NOV 108 "for conducting mining activities off bonded/permitted areas on the left side of the road going into the refuse pile."

f. That same day, WVDEP also issued NOV 109 for "failure to pass runoff from the disturbed areas through certified sediment control on the internal access road along the belt line and for the area that was off bonded area." WVDEP ordered Taishan to take remedial measures to "[e]nsure the designed drainage is passing through Pond #10" and to "[p]lace rock riprap along the access road ditch at belt line and at the left side of Pond #13."

g. As discussed in more detail below, on September 4, 2025, the West Virginia Public Service Commission inspected the Gary wellhouse, which is located on Taishan's permitted site, and found 2-4 inches of coal refuse inside and surround the wellhouse. This coal refuse had been there for some time.

h. On January 21, 2026, WVDEP issued Taishan NOV 110 for failure "to protect offsite areas from surface mining activities in that permittee has placed pond cleanings off site in areas below pond 2 and by pond 14."

i. On that same date, WVDEP issued NOV 111 for failure "to pass runoff from disturbed area thru [sic] certified Sediment structure in that a seep has occurred below outlet #1 discharging into spillway." WVDEP ordered Taishan to "[e]nsure all runoff discharges thru [sic] a certified sediment control structure."

j. On that same date, WVDEP issued NOV 112 for failure "to regrade, seed[,] and mulch areas around ponds #2, #3, #14[,] and #15." WVDEP ordered Taishan to "[r]emove all over stacked material from pond cleanings" and to "regrade and seed areas according to reclamation plan."

k. On April 1, 2026, WVDEP issued NOV 113 for failure to abate NOV 110 in a timely manner. In that NOV, WVDEP ordered Taishan to "[c]ease all mining related

activity on the entire permit, except for work needed to abate NOV and to maintain water quality."

l. On June 2, 2026, WVDEP issued NOV 114 for failure to "pass runoff thru [sic] approved sediment control at the base of the belt structure near the loadout."

m. On June 2, 2026, WVDEP also issued NOV 115 for failure to "control coal fines and dust coming off of the belt line structure at the load out area allowing it to leave the permit" area.

n. On July 12, 2026, WVDEP issued NOV 116 for "failure to maintain Pond #2 and pond #15 in that a hole has developed in the ponds causing water to exit before the approved spillways" and because "pond #15 has water going across the face coming off the access road." WVDEP ordered Taishan to stop the current leaks and prevent future leaks, and "to divert the water into pond #15 before the water reaches the face of the pond."

42. While Taishan Resources is not listed as an operator in WVSMCRA permit O002084, it is a de facto operator. Taishan Resources regularly corresponds with the WVDEP regarding NOVs and projects to abate the NOVs. For instance, a letter was sent on Taishan Resources letterhead to WVDEP regarding the "refuse disposal site project." Another letter on Taishan Resources letterhead sent by Cecil Patterson, Superintendent of Taishan Resources, was to WVDEP asking for "extensions on violations for drainage cleaning and I.B.R submission." These are all related to the NOVs described above. WVDEP also sent a letter to Taishan Resources regarding the consent order described in paragraph 41.c above. *See* Figure 2. No separate letter was sent to Taishan Coal. Thus, Taishan Resources holds itself out as knowledgeable about and directly responsible for the operations, and therefore appears to act as an "operator," of the Alpheus Preparation Plant and surface mine (O002084). *See* W. Va. Code § 22-3-3(o) (defining "operator").

west virginia department of environmental protection

Division of Mining and Reclamation
601 57th Street, SE
Charleston, WV 25304
(304) 926-0440

Harold Ward, Cabinet Secretary
dep.wv.gov

April 7, 2025

Taishan Resources, LLC
P.O. BOX 81
Gary, WV 24836

RE: Taishan Resources, LLC Permit O002084
Consent Order

Dear Operator:

Please be advised that the above referenced Consent Order signed on October 30, 2024, is hereby terminated. This action is based upon all violations associated with the consent order on Permit O002084 being abated and terminated.

If you have any questions, please contact me at 304-940-0274.

Sincerely,

Nicki Taylor
Digitally signed by: Nicki Taylor
DN: CN = Nicki Taylor email = nicki.m.taylor@wv.gov C = AD O = DEP OU = DMR
Date: 2025.04.10 10:51:58 -04'00'

Nicki Taylor
Assistant Director

cc: Heathe Rice, Inspector Supervisor
Brenda Cline, Inspector Specialist

*Figure 2*

***Baseline Hydrologic Information at Taishan's Surface Mine Site***

43. Taishan's operations occur on the same site as the sole source of water for the City of Gary.

44. The original WVSMCRA permit for O002084 included baseline hydrologic information of the nearby surface water and the onsite groundwater.

45. According to the probable hydrologic consequences determination included in the original permit for O002084, the "Alpheus Preparation Plant and related facilities are existing and have been in operation for 30 to 40 years" and 322 acres of surface area was already disturbed when the baseline data was collected. To assess baseline surface water quality for the site, two surface monitoring points (A-1 and A-2) were established upstream and downstream of the mining area. Baseline groundwater quality was assessed at a reservoir in an abandoned section of the U.S.

Steel No. 10 Mine—the same reservoir that the Gary well pulls from. *See* WVSMCRA Permit at Probable Hydrologic Consequences Determination ("Groundwater will be monitored once a month for the required parameters at the underground reservoir . . . . The Gary Municipal Water System obtains its water from this reservoir. . . . [L]ocal residents obtain domestic water from the Gary Municipal Water System.").

46. The baseline data reported at Station A-2, downstream of the facility, was as follows:

TABLE II

WATER TEST RESULTS FOR THE TUG FORK RIVER (Station A-2)

| Date (1979-80) | Flow (cfs) | pH (S.U.) | TSS (mg/1) | TDS (mg/1) | Tot. Acid. (mg/1) | Tot. Alk. (mg/1) | Tot. Iron (mg/1) | Diss. Iron (mg/1) | Tot. Mn (mg/1) |
|---|---|---|---|---|---|---|---|---|---|
| Nov. 15 | 82.0 | 7.7 | 7 | 260 | 3 | 72 | 0.28 | <0.02 | 0.18 |
| Dec. 17 | 32.0 | 7.6 | 11 | 310 | 4 | 100 | 0.30 | 0.13 | 0.18 |
| Jan. 24 | 350 | 6.8 | 26 | 220 | 6 | 29 | 0.43 | 0.06 | 0.08 |
| Mar. 20 | 165 | 7.6 | 19 | 220 | 2 | 46 | 0.17 | <0.02 | 0.14 |
| Jun. 10 | -- | 7.9 | 6 | 521 | 0 | 80 | 0.05 | -- | 0.07 |
| Aug. 12 | -- | 7.4 | 2 | 444 | 0 | 115 | 0.10 | -- | 0.07 |

*Figure 3*

47. The baseline data reported for the groundwater was as follows:

TEST RESULTS OF THE UNDERGROUND RESERVIOR

| DATE | PH | Fe (mg/1) | TDS (mg/1) | TSS (mg/1) | ALKALINITY (mg/1) As CaCo3 | ACIDITY (mg/1) |
|---|---|---|---|---|---|---|
| 7-05-83 | 7.0 | 0.05 | 826 | 4 | 250 | 0 |
| 8-01-83 | 7.1 | 0.40 | 900 | 4 | 240 | 0 |
| 9-06-83 | 7.3 | 0.20 | 795 | 2 | 200 | 0 |
| 10-03-83 | 7.6 | 0.60 | 645 | 3 | 165 | 0 |
| 11-07-83 | 7.3 | 0.60 | 734 | 3 | 200 | 0 |
| 12-05-83 | 7.5 | 0.05 | 439 | 2 | 85 | 0 |

Above are the test results for the first week of each of the last six months of 1983. It should be noted that no water was discharged during this period since it was used by the City of Gary and our Alpheus Preparation Plant.

*Figure 4*

48. According to the conclusions made in the probable hydrologic consequences,

a. "[t]he surface water monitoring results at Station A-2 reflects no adverse impact of cleaning operations on the surface water quality," "the quality of the water is good within the acceptable limits," and "[n]o further diminution of the surface water quality is anticipated as a result of continuation of the mining operation at the Alpheus Preparation Plant and related facilities";

b. "[a]ll flows from the Grapevine Hollow Refuse Areas is diverted into the underground reservoir," "there was no discharge from the pump station overflow even during wet periods," and "[i]t is not anticipated that surface or groundwater from Grapevine Hollow Refuse Area will be alter[]ed in the future"; and

c. "[d]ue to the fact that this area has been extensively mined in the past by U.S. Steel and others, further alteration of groundwater is deemed unlikely."

49. As of 1994, the Tug Fork was still a "High Quality Stream," which are streams with desirable native and/or stocked fishes. *See* WVSMCRA IBR #1 at pg. 7.

***Taishan's Contamination of the Surface Water, Groundwater, and Gary Water Supply***

50. Pursuant to its NPDES permit (permit no. WV1023750), mining permit (O002084), and WVSMCRA regulations, Taishan is required to monitor for water quality on a quarterly basis. *See* NPDES Permit at 14–15 (permit requirement to monitor receiving streams by grab sample for certain parameters); 30 C.F.R. § 816.41; W.Va. CSR § 38-1-14.7. Taishan is required to monitor both the water quality of the nearby surface waters and groundwater onsite.

*Surface Water Impacts*

51. Taishan is required to monitor at stream station "DSGB," which stands for Grapevine Branch. Taishan must monitor the stream flow, specific conductance, iron, manganese,

aluminum, and TDS at this stream station and report it in quarterly monitoring reports. NDPES Permit at 14.

52. Taishan's monitoring shows that its operations are negatively affecting the surface water in Grapevine Branch with high levels of specific conductance, iron, manganese, sulfates, aluminum, and total suspended solids ("TSS").

*Table 1*

| **DSGB Monitoring (Grapevine Branch)** | *Specific Conductance* µmhos @ 25 C | *Sulfates* mg/L | *Iron* mg/L | *Manganese* mg/L | *Aluminum* mg/L | *TSS* mg/L |
|---|---|---|---|---|---|---|
| 4/16/25 | **1,771** | **742.01** | **1.055** | 0.116 | <0.037 | 6 |
| 4/27/25 | **1,475** | **522.47** | **1.822** | 0.221 | <0.037 | 14 |
| 5/9/25 | **1,771** | 632.24 | 0.134 | <0.011 | 0.162 | <4 |
| 5/31/25 | **1,085** | 227.22 | **3.771** | 0.429 | <0.037 | 6 |
| 6/12/25 | 1,056 | 244.37 | 0.405 | 0.352 | <0.037 | <4 |
| 6/25/25 | 1,305 | 427.29 | 0.642 | 0.291 | <0.037 | <4 |
| 7/8/25 | **1,679** | **764.32** | **1.433** | 0.038 | 0.432 | **61** |
| 7/30/25 | **1,204** | **501.03** | 0.128 | 0.023 | <0.037 | <4 |
| 8/19/25 | **1,039** | 197.19 | 0.836 | 0.885 | <0.037 | <4 |
| 8/29/25 | **447** | 61.49 | 0.121 | <0.011 | 0.059 | <4 |
| 9/10/25 | **1,885** | **810.81** | 0.616 | 0.025 | 0.233 | 33 |
| 9/29/25 | **1,942** | **879.92** | 0.676 | 0.028 | 0.204 | **62** |
| 10/14/25 | **1,305** | 373.27 | 0.374 | 0.075 | <0.037 | <4 |
| 10/27/25 | **1,047** | 205.34 | **3.362** | 0.489 | <0.037 | 8 |
| 11/6/25 | **1,598** | **566.04** | **1.739** | 0.317 | <0.037 | 6 |
| 11/13/25 | **1,435** | **592.21** | <0.033 | <0.011 | <0.037 | <4 |
| 11/21/25 | **1,364** | 445.73 | **2.502** | 0.281 | <0.037 | <4 |
| 12/9/25 | **1,468** | 461.2 | 0.683 | 0.025 | <0.037 | 5 |
| 12/29/25 | **1,867** | **747.58** | <0.033 | <0.011 | <0.037 | 5 |
| 1/13/26 | **1,800** | **773.44** | 0.285 | <0.011 | <0.037 | 5 |
| 1/27/26 | **1,531** | **551.21** | 0.293 | 0.156 | <0.037 | <4 |
| 2/12/26 | **1,062** | 185.67 | **2.227** | 0.43 | <0.037 | 5 |
| 2/26/26 | **1,340** | 431.72 | **1.567** | 0.217 | 0.04 | 12 |
| 3/11/26 | **1,331** | 438.5 | **1.619** | 0.161 | 0.183 | 19 |
| 3/27/26 | **1,393** | 445.98 | **3.375** | 0.215 | 0.101 | **34** |

53. The levels of these parameters measured by Taishan in Grapevine Branch regularly exceed what is considered safe for aquatic life, as summarized in Table 2. Note that the Maximum Safe Level for Aquatic Life is represented as a range where sources differ.

*Table 2*

| **Parameter** | **Maximum Safe Level for Aquatic Life** |
|---|---|
| Specific Conductance | 300 µmhos/cm[5] |
| Sulfates | 500 mg/L[6] |
| Iron | 1 mg/L[7] |
| Manganese | Variable[8] |
| Aluminum | 0.00063 to 3.2 mg/L[9] |
| TSS | 40-80 mg/L[10] |

54. High levels of these pollutants have the following potential impacts on aquatic life:

a. "High specific conductivity can indicate the presence of high ion content in water. Water with elevated ionic strength can harm aquatic organisms. In 2011, the EPA

[5] *Coal River Mountain Watch v. Valenti*, No. 3:25-cv-103, ECF No. 47 at 7 (S.D. W. Va. Apr. 21. 2026) (citing EPA, Ionic Strength, https://perma.cc/X3N4-HK7G (last updated Mar. 10, 2025)).

[6] https://www.pa.gov/content/dam/copapwp-pagov/en/dep/documents/publicparticipation/environmentalquality/2012/documents/11%20tr13_rationale-sulfate_criteria.pdf.

[7] https://www.iowadnr.gov/media/7117/download?inline#:~:text=A.-,The%20Recommended%20Iron%20Criteria,is%20applied%20as%20total%20iron.

[8] The toxicity of manganese on aquatic life varies depending on other environmental conditions, like water hardness and pH. *See* https://www.epa.gov/sites/default/files/2015-06/documents/wi_397_04012005.pdf and https://www2.gov.bc.ca/assets/gov/environment/air-land-water/water/waterquality/water-quality-guidelines/approved-wqgs/manganese-tech.pdf.

[9] Like manganese, the toxicity of aluminum on aquatic life varies depending on other environmental conditions, like pH, total hardness, and DOC. *See* EPA 2018 Criteria, available at https://www.epa.gov/sites/default/files/2018-12/documents/aluminum-criteria-final-factsheet.pdf.

[10] "Total Suspended Solid levels less than 20 mg/L, is recommended for cold-water aquatic life. While specific regulatory limits vary, levels below 30 mg/L are often considered reasonable for warm water aquatic habitat, with values over 40–80 mg/L indicating cloudy, potentially impaired conditions." *See* https://upperwapsi.org/plan/challenges-and-opportunities/water-quality/total-suspended-solids-tss/.

released a report which concluded that conductivity above three hundred µS/cm significantly harms aquatic macroinvertebrate life." *Coal River Mountain Watch v. Valenti*, No. 3:25-cv-103, ECF No. 47 at 7 (S.D. W. Va. Apr. 21. 2026) (citing EPA, Ionic Strength, https://perma.cc/X3N4-HK7G (last updated Mar. 10, 2025)).

b. "Freshwater fish and aquatic communities cannot survive in elevated concentrations of sulfates. Maintaining a proper salt-to-water balance in a freshwater environment challenges most aquatic life, and in particular, aquatic insects. Macroinvertebrates maintain an internal ionic concentration that is higher than the surrounding environment by actively transporting ions in and out of their bodies through osmoregulation (Buchwalter and Luoma, 2005). Osmoregulation can be disrupted by large increases in certain ions (including sulfate). This disruption in water balance and ion exchange is capable of causing stress or death to the organism (Pond et al. 2008)."[11]

c. Iron above certain levels can be fatal to certain fish—specifically, carp, pike, and trout species.[12]

d. Manganese can promote "the formation of reactive oxygen species inducing oxidative stress, damage to tissues, inflammation and neurodegeneration in fish" and can harm algal species by inducing "iron deficiency, which can lead to inhibition of chlorophyll synthesis."[13]

---

[11] https://www.pa.gov/content/dam/copapwp-pagov/en/dep/documents/publicparticipation/environmentalquality/2012/documents/11%20tr13_rationale-sulfate_criteria.pdf.

[12] https://www.iowadnr.gov/media/7117/download?inline#:~:text=A.-,The%20Recommended%20Iron%20Criteria,is%20applied%20as%20total%20iron.

[13] https://www2.gov.bc.ca/assets/gov/environment/air-land-water/water/waterquality/water-quality-guidelines/approved-wqgs/manganese-tech.pdf.

e. The EPA has established aquatic life ambient water quality criteria for aluminum in fresh waters. EPA has explained that aluminum "can inhibit an aquatic organism's ability to regulate salt concentrations and clog fish gills, potentially resulting in death or affecting growth and reproduction."[14]

f. "High measures of total suspended solids indirectly harms aquatic species when solids settle out and clog gills, destroy habitat, and reduce the availability of food. Furthermore, suspended materials in streams promote solar heating, which can increase water temperatures, and reduce light penetration, which reduces photosynthesis, both of which contribute to lower dissolved oxygen. Sediment also can carry chemicals attached to the particles, which can have harmful environmental effects."[15]

55. The high levels of pollutants in Grapevine Branch, as seen in Table 1, cannot be attributable to Taishan's permitted discharges from its CWA outfalls. As its NDPES permit makes clear, its monitoring of Grapevine Branch "shall be done approximately as the same time as the discharge points are monitored." NPDES Permit at 14. Taishan's monitoring reports show, and the NPDES permit itself indicates, it has not discharged from Outlet 001—the only outlet that discharges into Grapevine Branch—since 2024. The source of pollution in Grapevine Branch seen in Table 1, therefore, must be contributions separate from the permitted NPDES discharge.

56. Additionally, Taishan's most recent NPDES permit indicates that the Tug River—into which contaminated water from the mine site may eventually flow—has a TMDL for iron. *See* NPDES Permit at Rationale Page.

---

[14] EPA 2018 Criteria, available at https://www.epa.gov/sites/default/files/2018-12/documents/aluminum-criteria-final-factsheet.pdf.

[15] https://upperwapsi.org/plan/challenges-and-opportunities/water-quality/total-suspended-solids-tss/.

*Groundwater Impacts*

57. Taishan's own water quality monitoring also shows poor water quality for similar pollutants in its groundwater monitoring well, GW-1, as seen in Table 3.

*Table 3*[16]

| **GW-1** | *Specific Conductance* µmhos @ 25 C | *Sulfates* mg/L | *Iron* mg/L | *Manganese* mg/L | *Aluminum* mg/L | *TSS* mg/L | *TDS* mg/L |
|---|---|---|---|---|---|---|---|
| Q2 2024 | 940 | 147.02 | 1.249 | 0.509 | 0.037 | < 4 | 564 |
| Q4 2024 | 982 | 132.91 | 1.109 | 0.473 | < 0.037 | 6 | 582 |
| Q1 2025 | 1,409 | 47.13 | 1.373 | 0.867 | < 0.037 | < 4 | 956 |
| Q2 2025 | 1,188 | 411.61 | 3.099 | 0.836 | < 0.037 | 6 | 764 |
| Q3 2025 | 1,130 | 360.67 | 0.445 | 0.480 | < 0.037 | < 4 | 770 |
| Q1 2026 | 1,020 | 164.12 | 4.935 | 0.466 | 0.165 | 42 | 639 |

58. The levels of various pollutants in GW-1 indicate that the groundwater quality has worsened since the baseline monitoring, and it is poor and unfit for human consumption, as shown in Table 4 below. While at some surface mine sites, poor drinking water quality would be an abstract problem, the polluted water here causes very concrete harm to the City of Gary and its customers, including Plaintiffs.

59. As Taishan knows, the City of Gary's sole source of water for its residents on the public drinking water supply comes from the same aquifer that GW-1 monitors. *See* WVSMCRA Permit at Probable Hydrologic Consequences Determination ("Groundwater will be monitored once a month for the required parameters at the underground reservoir . . . . The Gary Municipal Water System obtains its water from this reservoir. . . . [L]ocal residents obtain domestic water from the Gary Municipal Water System."); *see also id.* at DR-4, p.9, Item 23.d.2.

[16] These values are all obtained from Taishan's Quarterly Water Monitoring Reports. Taishan inexplicably reported "no flow" for GW-1 in Q4 2023, Q1 2024, Q3 2024, and Q4 2025.

60. Taishan's operations have also contaminated the City of Gary's public water supply.

61. "The City of Gary (Gary Municipal Water) operates a Public Water System (PWS ID WV3302420) in McDowell County, and provides water service to approximately 416 customers." PSC Report at pg. 14.

62. The City of Gary "utilizes a single groundwater well near the confluence of Grapevine Branch and Tug Fork for its source water." PSC Report at pg. 4.[17] This groundwater well is located inside a well house, which "is situated on an active WV DEP Division of Mining and Reclamation (DMR) Article III Permit." PSC Report at pg. 5. That Article III Permit is Taishan's permit O002084.

63. The City of Gary's well house is located very close to Taishan's GW-1 well, which is depicted on Figure 1 and Exhibit A.

64. Taishan's GW-1 well and the City of Gary well are pulling water from the same aquifer. *See* WVSMCRA Permit at Probable Hydrologic Consequences Determination; *see also id.* at DR-4, p.9, Item 23.d.2. Thus, Taishan's monitoring results of its own groundwater is indicative of the levels of contamination in the City of Gary well.

65. Unsurprisingly, independent monitoring of the City of Gary well also shows that it is contaminated with similar constituents.

66. For instance, "WV DHHR OEHS indicates that Gary's groundwater well (WL-001) . . . ha[s] high levels of iron, manganese, and alkalinity." PSC Report at pg. 4. More specifically, "Gary provided the pH and Iron (Fe) values recorded on the raw water source. The raw water

[17] On the map of Taishan's operations (Figure 1 and Exhibit A), the City of Gary's wellhouse is located just to the west of Outlet 001 and GW-1.

sample results indicate a high level of Iron, averaging above 2.5 mg/L, and a mostly static pH around 6.5." PSC Report at pg. 4.

67. The WV PSC Report also recognized that the Gary well is contaminated. PSC Report at pg. 4. The PSC Report was authored by Brandon Crace, who is a Technical Analyst and engineer in the Engineering Division at the West Virginia Public Service Commission. Mr. Crace has a degree in civil engineering and has worked for approximately 20 years in the private and public sectors involving water and sewer engineering. PSC Tr. at 59.[18]

68. During its September 4, 2025 inspection, conducted by Mr. Crace, the PSC found "extensive iron precipitate" around the City of Gary wellhouse. PSC Report at pg. 4.

69. The PSC Decision also recognized the contamination—"[a] well or spring near the Grapevine Branch well shows indications of iron in the local water." PSC Decision at 13, Finding of Fact 5. This is an artesian well located directly in front of the wellhouse. *See* PSC Tr. at 70–71 (Brandon Crace testimony).

70. This contamination is not surprising because, in addition to Taishan's numerous mining permit violations described above, Taishan's operations have allowed coal refuse to surround and enter the Gary wellhouse.

71. "There have been several occasions, with documented evidence, where the well house has been flooded by surface water runoff that displaced material from the remining operations. The runoff carries gray, dark gray, and black material from the remining activities and covers the floor of the well house." PSC Report at pg. 5.

[18] The PSC conducted a hearing on March 19, 2026, and it was recorded in an official transcript that is publicly available at Docket No. 25-0611-W-DU. This will be referred to as the "PSC Transcript."

72. Coal refuse surrounded and coated the wellhouse floor during the PSC's September 2025 inspection of the wellhouse. This dark gray or black "material was observed during [the PSC's] site visit and was noted as: being hardened (dried in place), being approximately 2-4 inches thick, covering the entire floor, creating an unsafe (slick and sticky floor) work environment, difficult to remove, etc." PSC Report at pg. 5.

73. The PSC Report also included several images of this coal refuse material inside and out of the wellhouse, which are included as Figures 5 through 9 below.

Site Visit Pictures
Performed on 09/04/2025

000024
Page 1 of 41



Grapevine Branch Wellhouse Building
Interior View – Pump #2, Control and Electric Panels in View
Note: Floor Covered with Fine Coal Refuse, 5-Gallon Bucket Full of Fine Coal Refuse, Exposed Wiring, Broken Conduit, Water Bottles on Top of Control Boxes, Roof Failure Resulting in Leaks, Open Electrical Breaker Box, Walls Stained with Rust and Other Substances

*Figure 5*

000025

Site Visit Pictures
Performed on 09/04/2025

Page 2 of 41



Grapevine Branch Wellhouse Building
Interior View
Note: Floor Covered with Fine Coal Refuse, Material Covering Floor Creates Unsafe Fall Conditions, Walls Stained with Rust and Other Substances, Material Appears to be Up to 4" Thick

*Figure 6*

000026

Site Visit Pictures
Performed on 09/04/2025

Page 3 of 41



Grapevine Branch Wellhouse Building
Interior View
Note: Floor Covered with Fine Coal Refuse, Material Covering Floor Creates Unsafe Fall Conditions, Material Appears to be Up to 4" Thick

*Figure 7*

000029

Site Visit Pictures
Performed on 09/04/2025

Page 6 of 41



Grapevine Branch Wellhouse Building
Exterior View
Note: Coal Refuse Surrounding the Building, Double Door Entry to Wellhouse has Rust Through the Bottom of the Doors, Exterior Walls Stained with Rust and Other Substances, Coal Refuse Appears to Have Iron Precipitate

*Figure 8*

000031

Site Visit Pictures
Performed on 09/04/2025

Page 8 of 41



Grapevine Branch Wellhouse
Well/Pump (Owned by Others) Supplies Water to a Re-Mining Operation
Gray Building – Grapevine Branch Wellhouse
Note: Extensive Iron (Fe) Precipitate

*Figure 9*

74. As these Figures show, Taishan's coal refuse has surrounded the outside of the City of Gary wellhouse and coated the floor inside the wellhouse itself. From the PSC investigation, it appears this coal refuse had been inside the wellhouse for some time before September 2025.[19]

75. The problem is not limited to past contamination. As the PSC Decision recognized, Taishan's coal refuse will continue to infiltrate the wellhouse over time—Gary's well house "is situated below the re-mining site. Mine waste is carried toward the well house by rainwater and accumulates therein." PSC Decision at 13, Finding of Fact 4. Gary employees also attempted to remove this mine waste from the well house, but due to its location in relation to the mine site, the waste will continue to move downhill as runoff into the wellhouse from the site. PSC Decision at 10.

76. Further, in an email from Ms. Gailyn Markham at the West Virginia Department of Health to a concerned citizen on March 27, 2026, she explained that, "[t]o the West Virginia Department of Health's (DH) knowledge, the [Gary water] source is vulnerable to contamination from surface inflow from a coal mine refuse pond with improperly sealed wells, which is located immediately uphill of the system." This is Taishan's GW-1 well.

***Plaintiffs Cannot Drink or Use the Water from Their Tap***

77. As explained above, Taishan has contaminated the groundwater at its mining site in Gary, West Virginia. That is the same groundwater that the City of Gary uses as the sole source for the 416 customers it serves.

[19] "Staff requested that Gary describe the procedure when water personnel becomes aware of coal refuse being present inside the wellhouse building. Gary stated 'When coal refuse is found in well, we clean out the building and we notify Dept. of Health.' However, approximately 2 - 4 inches of coal refuse was observed during Engineering Staff's Site Visit and footprints existed in the displaced refuse." PSC Report at pg. 4.

78. As a result of Taishan's contamination of the groundwater, Plaintiffs and all others similarly situated (i.e., those on the public drinking water system) cannot use their tap water.

79. The Gary public water is murky, often stained yellow, brown, or black, and has a bad odor. *See* Figures 10 and 11.




*Figures 10 & 11*

80. The water not only looks contaminated, but testing confirms that it is. Just like Taishan's GW-1 well and the Gary well water, the tap water supplied to residents on the public drinking water system has elevated levels of iron, manganese, sulfates, and TDS.

81. For example, at the March 19 hearing, the PSC was also presented with tap water testing results with high levels of iron, manganese, TDS, and chlorine. *See* PSC Decision at 5; Comment Ex. 1 (reproduced below as Figure 12).

| Measure | Typical Safe Level | This Sample |
|---|---|---|
| Total Dissolved Solids | ≤1000 ppm | 2060 ppm (~2x higher) |
| Manganese | ≤0.05 ppm | 0.5 ppm (~10x higher) |
| Iron | ≤0.4 ppm | 1 ppm (~2–3x higher) |
| Chlorine | ≤4 ppm | Up to 15 ppm (~3–4x higher) |
| Lead | 0 ppm | 5 ppb (present) |

*Figure 12*

82. Even more recent sampling of one resident's tap water in Gary Bottom, an area of Gary, confirms high levels of iron and manganese, and elevated levels of aluminum, silica, and sulfur. *See* Figure 13.

Pace Analytical Services, LLC
225 Industrial Park RD
Beaver, WV 25813
(800)999-0105

**ANALYTICAL RESULTS**

Project: Municipal Water Samples
Pace Project No.: 30853186

**Sample: GARY MUNICIPAL WATER** **Lab ID: 30853186002** Collected: 03/05/26 10:55 Received: 03/16/26 07:00 Matrix: Water

| Parameters | Results | Units | Report Limit | MDL | DF | Prepared | Analyzed | CAS No. | Qual |
|---|---|---|---|---|---|---|---|---|---|
| **BVR 200.7 Metals Total** | Analytical Method: EPA 200.7 Preparation Method: EPA 200.2 | | | | | | | | |
| | Pace Analytical Services - Beaver | | | | | | | | |
| Aluminum | **35.8** | ug/L | 20.0 | 14.1 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7429-90-5 | |
| Antimony | ND | ug/L | 20.0 | 7.3 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7440-36-0 | |
| Arsenic | ND | ug/L | 20.0 | 10.0 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7440-38-2 | |
| Barium | **26.7** | ug/L | 5.0 | 0.89 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7440-39-3 | |
| Beryllium | ND | ug/L | 1.0 | 0.50 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7440-41-7 | |
| Boron | **37.6J** | ug/L | 50.0 | 31.8 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7440-42-8 | |
| Cadmium | ND | ug/L | 2.0 | 0.50 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7440-43-9 | |
| Calcium | **65800** | ug/L | 500 | 89.9 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7440-70-2 | |
| Chromium | ND | ug/L | 5.0 | 2.5 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7440-47-3 | |
| Cobalt | ND | ug/L | 5.0 | 2.0 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7440-48-4 | |
| Copper | **67.2** | ug/L | 6.0 | 5.6 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7440-50-8 | |
| Iron | **512** | ug/L | 50.0 | 29.6 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7439-89-6 | |
| Lead | ND | ug/L | 10.0 | 4.8 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7439-92-1 | |
| Lithium | **149** | ug/L | 100 | 39.3 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7439-93-2 | N2 |
| Magnesium | **27200** | ug/L | 500 | 106 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7439-95-4 | |
| Manganese | **127** | ug/L | 5.0 | 2.7 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7439-96-5 | |
| Molybdenum | ND | ug/L | 5.0 | 2.9 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7439-98-7 | |
| Nickel | ND | ug/L | 5.0 | 2.6 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7440-02-0 | |
| Phosphorus | **109J** | ug/L | 500 | 69.9 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7723-14-0 | N2 |
| Potassium | **3290** | ug/L | 500 | 258 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7440-09-7 | |
| Selenium | ND | ug/L | 20.0 | 10.0 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7782-49-2 | |
| Silica | **10500** | ug/L | 428 | 179 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7631-86-9 | |
| Silicon | **4900** | ug/L | 200 | 83.7 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7440-21-3 | N2 |
| Silver | ND | ug/L | 5.0 | 3.1 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7440-22-4 | |
| Sodium | **130000** | ug/L | 500 | 399 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7440-23-5 | |
| Strontium | **1460** | ug/L | 10.0 | 1.4 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7440-24-6 | N2 |
| Sulfur | **59100** | ug/L | 2000 | 1910 | 10 | 03/18/26 02:29 | 03/19/26 19:37 | | N2 |
| Thallium | ND | ug/L | 10.0 | 5.6 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7440-28-0 | |
| Tin | ND | ug/L | 100 | 25.9 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7440-31-5 | |
| Titanium | ND | ug/L | 11.0 | 10.3 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7440-32-6 | |
| Vanadium | ND | ug/L | 10.0 | 1.4 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7440-62-2 | |
| Zinc | **215** | ug/L | 20.0 | 11.2 | 1 | 03/18/26 02:29 | 03/18/26 14:34 | 7440-66-6 | |

**REPORT OF LABORATORY ANALYSIS**
This report shall not be reproduced, except in full,
without the written consent of Pace Analytical Services, LLC.

Date: 03/31/2026 08:59 AM

Page 6 of 11

*Figure 13*

83. The Gary tap water regularly exceeds the following national secondary drinking water standards for iron, manganese, sulfates, and TDS that EPA has established.[20]

*Table 4*

| Parameter | EPA Level |
|---|---|
| Iron | 0.3 mg/L |
| Manganese | 0.05 mg/L |
| Sulfates | 250 mg/L |
| TDS | 500 mg/L |

[20] *See* https://www.epa.gov/sdwa/drinking-water-regulations-and-contaminants.

84. Dr. Kate Waldeck, a pediatric critical care doctor, specifically reviewed the monitoring results of the Gary water in Figure 12 and testified at the March 2026 PSC hearing that "the water Gary provides is not safe for children" and that "the exposure effects are cumulative for all customers." PSC Decision at 5; *see also* PSC Tr. at 23–32.

85. Iron discolors the water you drink. "Iron may give water a metallic taste," can cause "yellow, red, or brown stains on dishes, laundry, and plumbing fixtures," and can "clog wells, pumps, sprinklers, dishwashers, and other devices over time." Additionally, "[i]f there is iron in the water, it may be harder to get rid of harmful bacteria."[21] Utilities treat water with chlorine to get rid of bacteria. High levels of chlorine can cause skin irritation and gastrointestinal upset. PSC Decision at 5 (citing Dr. Waldeck's testimony).

86. Manganese in drinking water also discolors the water, has a metallic taste, and results in staining. "Studies suggest an association between exposure to manganese in drinking water and neurological issues in infants and children, such as changes in behavior, lower IQ, speech and memory difficulties, and lack of coordination and movement control."[22] "Chronic exposure to manganese in water can reduce attention span and cause cognitive delays, particularly in children." PSC Decision at 4–5; *see also* PSC Tr. at 23–32 (Dr. Waldeck testimony).

87. Drinking water with high levels of sulfate "can give water a bitter or medicinal taste and can have laxative effects . . . People who are not used to drinking water with high sulfate can get diarrhea and dehydration from drinking the water. Infants are often more sensitive to sulfate than adults."[23] Animals are similarly sensitive to high levels of sulfate. *Id.*

---

[21] https://www.health.state.mn.us/communities/environment/water/wells/waterquality/iron.html.

[22] https://wqa.org/resources/manganese/.

[23] https://www.health.state.mn.us/communities/environment/water/wells/waterquality/sulfate.html.

88. "Tap water with dissolved sediment present should not be used in baby formula because infants are susceptible to this form of dehydration. Individuals with sensitive gastrointestinal tracts may suffer discomfort from ingesting water with dissolved sediment . . . . The sediments present also provide a substrate for bacteria growth in water requiring aggressive treatment." PSC Decision at 5; *see also* PSC Tr. at 23–32 (Dr. Waldeck testimony).

89. The Gary public water is not suitable for drinking. *See* PSC Tr. at 14, 20–21, 34.

90. The Gary public water is not suitable for cooking. *See* PSC Tr. at 12, 21.

91. The Gary public water is not suitable for bathing, *see* PSC Tr. at 12, 21, 37, although most residents have no other choice.

92. The Gary public water causes skin irritation from excess chlorine, which is used to try to treat the iron, manganese, sulfates, and TDS in the water from Taishan's operations. *See* PSC Tr. at 12–13.

93. The Gary public water stains clothes. *See* PSC Tr. at 12.

94. The Gary public water corrodes appliances, like hot water heaters and dishwashers, and requires them, or their parts, to be replaced more frequently. Plaintiffs have incurred and will continue to incur these costs.

95. Taishan's mining operations caused and continue to cause the contamination of the Gary public water supply. Indeed, as one resident testified, the Gary public water "quality did not decline until the last four to five years," when a "company recently began mining about that time." PSC Decision at 4–5 (see Ms. Muncy and Mr. Walker's testimony); *see also* PSC Tr. at 13–16, 35–37 (same). That company is undoubtedly Taishan.

96. And this is not just one resident's belief; the USGS has also concluded the Gary water quality has recently declined—"[i]n recent years, the quality of the water available from the

City's public supply well has been degraded by increased turbidity and concentrations of total dissolved solids, iron, and manganese."[24]

97. Because Plaintiffs and other Gary residents cannot use their tap water for drinking, cooking, or other household tasks, many rely on community water distribution groups that distribute bottled water to residents for free on a semi-regular schedule, usually every other week. However, even residents that are able to take advantage of this generosity cannot rely solely on these free distribution events to meet their water needs. Instead, they must buy bottled water, on top of the water bill they pay for the tainted water from their tap.

**PLAINTIFFS' SPECIFIC ALLEGATIONS**

98. Taishan's unlawful and negligent conduct, as set forth herein, caused the contamination of the Gary public water supply.

99. Plaintiffs have suffered, and will continue to suffer, damages to their person and property as a result of this water contamination. Specifically, and as described in more detail for each Plaintiff, they have suffered, and will continue to suffer, the following types of harms as a result of Taishan's water contamination:

a. Plaintiffs are not able to drink their water or use it for most household tasks. This interferes with the use, enjoyment, and possession of their properties.

b. Because Plaintiffs cannot drink their water, they spend considerable time and money to replace the water with water bottles or expensive water filters that must be replaced frequently.

c. Plaintiffs pay a water bill for water they cannot use.

---

[24] USGS, Reconnaissance of Potential Alternate Water Supply Sources for the City of Gary, West Virginia 4 (2025), available at https://pubs.usgs.gov/of/2025/1037/ofr20251037.pdf.

d. Plaintiffs incur costs replacing clothes that are stained from washing them in the contaminated water.

e. For those who own their property, Plaintiffs' inability to drink or use their water severely diminishes their property value.

f. Plaintiffs' appliances, like hot water heaters, laundry machines, and dishwashers, break more easily because of corrosion. Plaintiffs incur substantial costs replacing these appliances, or parts thereof, more frequently than they would have to if their water was clean.

100. Plaintiffs would not incur these costs or experience these damages if their water were clean.

101. Plaintiffs also qualify for and demand water replacement under WVSMCRA.

102. Plaintiffs also demand water replacement as a remedy for Taishan's unlawful and negligent conduct.

***Sandra Blankenship***

103. Sandra Blankenship is a citizen of West Virginia, residing at 2393 Miracle Mountain Rd, Elbert, WV 24830.

104. Sandra Blankenship is a customer of and provided water by the City of Gary to her residence in Elbert. That tap water is contaminated as a result of Taishan's mining operations.

105. Sandra Blankenship pays monthly water bills for water she cannot use. These bills frequently cost over $130 per month.

106. Because Sandra Blankenship cannot use her tap water for drinking or cooking, she spent $100 to buy a water cooler and regularly buys two to three jugs of water, that cost $8 per jug, each week to use in the water cooler. She also buys cases of water and regularly goes through

a case a day in the household. Buying this water allows her to have water for cooking, drinking, and her coffee.

107. Sandra Blankenship has to undergo effort to secure this replacement water, as delivery is not available and cases of water are heavy to carry.

108. Sandra Blankenship owns her residence and the property value of her residence is diminished as a result of her tap water's contamination. Her property would be worth more if the tap water at her house was not contaminated by Taishan.

109. Sandra Blankenship has to replace various appliances and common household goods more often than she would have to if her water were not contaminated. For instance, her coffee maker frequently is destroyed, she must replace her hot water heater element every 4 to 6 months, she cannot run her ice maker, her tub is stained, and her pots and pans are frequently destroyed. Sandra Blankenship would not incur these expenses as frequently if her water was clean.

110. Sandra Blankenship similarly has to frequently replace her clothes because they become stained and they retain an unpleasant odor. Sandra Blankenship would not need to replace her clothing as frequently if her water was clean.

111. Sandra Blankenship also has seven children in the home, ages 1 to 17, that are exposed to this water.

112. Sandra Blankenship suffers great annoyance and inconvenience by not being able to use her tap water.

113. Sandra Blankenship is entitled to compensatory damages from Taishan in an amount sufficient to reimburse her for these damages suffered.

114. Sandra Blankenship is entitled to emergency, temporary, and permanent replacement water under WVSMCRA and common law principles because Taishan contaminated her drinking water.

***Kierstein Lester***

115. Kierstein Lester is a citizen of West Virginia, residing at 65 Apple Valley Lane, Gary, WV 24836.

116. Ms. Lester is a customer of and provided water by the City of Gary to her residence in Gary.[25] That tap water is contaminated as a result of Taishan's mining operations.

117. With her husband, Ms. Lester pays monthly water bills for water she cannot use. These bills frequently cost over $150 each month.

118. Because Ms. Lester cannot drink her tap water, she buys water bottles for drinking water and for cooking, like boiling pasta. However, she lives paycheck to paycheck on a single income and cannot afford cases of water before pay days.

119. Ms. Lester owns her residence and the property value of her residence is diminished as a result of her tap water's contamination.[26] Her property would be worth more if the tap water at her house was not contaminated by Taishan.

120. Ms. Lester has to replace various appliances and common household goods more often than she would have to if her water were not contaminated. For instance, she must replace her hot water heater element every three months or so, and her bathroom fixtures (shower head,

[25] Ms. Lester's husband, Richard Lester, is technically the customer on the water bill, but Ms. Lester also uses that water.

[26] In the event that Ms. Lester is deemed to not be the owner of the property, in the alternative, Sandra Blankenship owns this property and suffers from the property value dimunition for this property.

toilet, tub, shower walls) quickly corrode or stain because of the water. Ms. Lester would not incur these expenses as frequently if her water was clean.

121. Ms. Lester similarly has to frequently replace her clothing because it becomes stained. Ms. Lester cannot buy white clothes without them turning yellow after washing. Ms. Lester would not need to replace her clothing as frequently if her water was clean.

122. Ms. Lester also has seven children in the home, ages 4 to 15, that are exposed to this water. These children, along with Ms. Lester, have no other choice but to bathe in the water, wash their hands with it, and brush their teeth with it.

123. Ms. Lester suffers great annoyance and inconvenience by not being able to use her tap water. She particularly worries about what exposure to this water over the long term will mean for her children.

124. Ms. Lester is entitled to compensatory damages from Taishan in an amount sufficient to reimburse her for these damages suffered.

125. Ms. Lester is entitled to emergency, temporary, and permanent replacement water under WVSMCRA and common law principles because Taishan contaminated her drinking water.

***Tshonia Tolliver and Dakota Blankenship***

126. Tshonia Tolliver and Dakota Blankenship are citizens of West Virginia, residing at 2678 Miracle Mountain Rd, Elbert, WV 24830.

127. Ms. Tolliver and Mr. Blankenship are customers of and provided water by the City of Gary to their residence in Elbert. That tap water is contaminated as a result of Taishan’s mining operations.

128. Ms. Tolliver pays monthly water bills for water her and her family cannot use.

129. Because Ms. Tolliver and Mr. Blankenship cannot use their tap water for drinking or cooking, they spend approximately $80 per month on bottled water for drinking and another $130 per month on bottled water for cooking.

130. Mr. Blankenship owns the residence and the property value of his residence is diminished as a result of her tap water's contamination. His property would be worth more if the tap water at his house was not contaminated by Taishan.

131. Ms. Tolliver and Mr. Blankenship have to replace various appliances and common household goods more often than they would have to if their water were not contaminated. For instance, they frequently have to do maintenance on their hot water heater, including replacing the element. They would not incur these expenses as frequently if their water was clean.

132. Ms. Tolliver and Mr. Blankenship similarly have to frequently replace their clothes because they become stained and dingy, which they try to mask with pine sol or some other cleaning solution with a strong scent. Their white clothes become yellow when they wash it in the contaminated water. They would not need to replace their clothing as frequently if their water was clean.

133. Ms. Tolliver and Mr. Blankenship also boil their water before they bathe in an attempt to make it cleaner or otherwise make them feel better about bathing in it, which is an added burden and expense to them that they would not have to endure if their water were clean.

134. Ms. Tolliver and Mr. Blankenship have three children at home, and 11 nieces and nephews that visit their home daily. They keep these children from drinking the water but they are nonetheless exposed to it when they bathe.

135. Ms. Tolliver and Mr. Blankenship suffer great annoyance and inconvenience by not being able to use their tap water.

136. Ms. Tolliver and Mr. Blankenship are entitled to compensatory damages from Taishan in an amount sufficient to reimburse them for these damages suffered.

137. Ms. Tolliver and Mr. Blankenship are entitled to emergency, temporary, and permanent replacement water under WVSMCRA and common law principles because Taishan contaminated their drinking water.

***Kathy Vanover***

138. Kathy Vanover is a citizen of West Virginia, residing at 259 Sullivan Dr, Gary, WV 24836.

139. Ms. Vanover is a customer of and provided water by the City of Gary to her residence in Gary. That tap water is contaminated as a result of Taishan's mining operations.

140. Ms. Vanover pays monthly water bills for water she cannot use. These bills cost approximately $75 per month.

141. Because Ms. Vanover cannot use her tap water, she regularly drives to and hauls back 20 jugs of water from Maybeury, a natural spring on the side of the road roughly 17 miles away from Gary.

142. Ms. Vanover has purchased water filtration systems to try to make the water from her tap better. Specifically, she has filters under her sink. She spends approximately $60 for three filters, and she has to buy filters every three months.

143. Ms. Vanover owns her residence and the property value of her residence is diminished as a result of her tap water's contamination. Her property would be worth more if the tap water at her house was not contaminated by Taishan.

144. Ms. Vanover has to replace various appliances and common household goods more often than she would have to if her water were not contaminated. For instance, she must replace

her hot water heater element every 6 months or so, and her toilets turn black and brown and grit builds up inside the toilet which causes it to run constantly. Ms. Vanover would not incur these expenses as frequently if her water was clean.

145. Ms. Vanover similarly has to frequently replace her clothes because they become stained and they retain an unpleasant odor. Ms. Vanover uses bleach to try to take the odor out of the water before doing laundry, but she still has to replace her clothes often and any light-colored clothes she buys become dingy quickly. She would not need to replace her clothing as frequently if her water was clean.

146. Ms. Vanover has two grandchildren that sometime visit her home. They do not drink the water but sometimes have to shower in it.

147. Ms. Vanover suffers great annoyance and inconvenience by not being able to use her tap water.

148. Ms. Vanover is entitled to compensatory damages from Taishan in an amount sufficient to reimburse her for these damages suffered.

149. Ms. Vanover is entitled to emergency, temporary, and permanent replacement water under WVSMCRA and common law principles because Taishan contaminated her drinking water.

***Sheila Hunley***

150. Sheila Hunley is a citizen of West Virginia, residing at 389 Sawmill Hollow Rd, Wilcoe, WV 24895. She owns her home, but rents the land her home sits on from Pocahontas Land Company.

151. Ms. Hunley is a customer of and provided water by the City of Gary to her residence in Wilcoe. That tap water is contaminated as a result of Taishan's mining operations.

152. Ms. Hunley pays monthly water bills for water she cannot use. These bills frequently cost $75 per month.[27]

153. Because Ms. Hunley cannot use her tap water, she regularly purchases jugs of water at the store for drinking and cooking. She only uses her tap water for laundry, dishes, and showering.

154. Ms. Hunley has to replace various appliances and common household goods more often than she would have to if her water were not contaminated. For instance, she regularly has to replace the hot water heater element. She has also paid out of pocket to repair the water line going into the house. Ms. Hunley would not incur these expenses as frequently if her water was clean.

155. Ms. Hunley similarly has to frequently replace her clothes because they become stained and they retain an unpleasant odor. Even dark clothes stain with dark spots. Ms. Hunley would not need to replace her clothing as frequently if her water was clean.

156. Ms. Hunley also has a young granddaughter, age 6, who is exposed to this water, but she does not drink it.

157. Ms. Hunley suffers great annoyance and inconvenience by not being able to use her tap water.

158. Ms. Hunley is entitled to compensatory damages from Taishan in an amount sufficient to reimburse her for these damages suffered.

159. Ms. Hunley is entitled to emergency, temporary, and permanent replacement water under WVSMCRA and common law principles because Taishan contaminated her drinking water.

---

[27] This bill covers water, sewer, and trash, so only a portion of this bill is for water.

***Rhonda Finley***

160. Rhonda Finley is a citizen of West Virginia, residing at 50 Postal Lane, Wilcoe, WV 24895.

161. Ms. Finley is a customer of and provided water by the City of Gary to her residence in Wilcoe.[28] That tap water is contaminated as a result of Taishan's mining operations.

162. Ms. Finley pays half of the monthly water bills for water she cannot use. These bills frequently cost $80 per month.

163. Because Ms. Finley cannot use her tap water for drinking or cooking, she relies on bottled water, getting it free from community distribution events when she can but inevitably buying water when the free water runs out. She frequently cooks rice, pasta, beans, and potatoes in bottled water, which all require a lot of water to cook.

164. Ms. Finley has to replace various appliances and common household goods more often than she would have to if her water were not contaminated. For instance, she has to replace the hot water heater element twice a year, the hot water heater corrodes inside, and the sinks and toilets are stained. Ms. Finley would not incur these expenses as frequently if her water was clean.

165. Ms. Finley similarly has to frequently replace her clothing and bedding because they become stained and ruined. She brings laundry to her children's home in North Carolina once a month to avoid washing at least some laundry in the contaminated water. Ms. Finley would not need to replace her clothing and bedding as frequently if her water was clean.

166. Ms. Finley also has grandchildren, nieces and nephews, and great nieces and nephews that come to her residence, but she does not allow them consume the water. She also does not allow her daughter's dog to drink the water.

---

[28] Ms. Finley's mother-in-law is listed on the water bill, but Ms. Finley nonetheless uses the water and pays half the bill.

167. Ms. Finley suffers great annoyance and inconvenience by not being able to use her tap water. It depresses her to wake up in the morning and see the water is still brown and still contaminated.

168. Ms. Finley is entitled to compensatory damages from Taishan in an amount sufficient to reimburse her for these damages suffered.

169. Ms. Finley is entitled to emergency, temporary, and permanent replacement water under WVSMCRA and common law principles because Taishan contaminated her drinking water.

***Polly Blankenship***

170. Polly Blankenship is a citizen of West Virginia, residing at 3868 Black Diamond Hwy, Thorpe, WV 24888.

171. Polly Blankenship is a customer of and provided water by the City of Gary to her residence in Thorpe. That tap water is contaminated as a result of Taishan's mining operations.

172. Polly Blankenship pays monthly water bills for water she cannot use. These bills frequently cost over $200 to $300 per month.

173. Because Polly Blankenship cannot use her tap water for drinking or cooking, she must buy water. She usually has to spend $80 of her food stamps, twice a month, to buy water bottles, instead of being able to use them to buy groceries.

174. Polly Blankenship owns her residence and the property value of her residence is diminished as a result of her tap water's contamination. Her property would be worth more if the tap water at her house was not contaminated by Taishan.

175. Polly Blankenship has to replace various appliances and common household goods more often than she would have to if her water were not contaminated. For instance, she has to buy a new washer every year or two, had to replace her hot water element four times in the last

year, and her tub is destroyed by staining from the water. Polly Blankenship would not incur these expenses as frequently if her water was clean.

176. Polly Blankenship similarly has to frequently replace her clothes because they become stained. She cannot wash white clothes even with bleach, and loads of clothes are often ruined by the tainted water. Polly Blankenship would not need to replace her clothing as frequently if her water was clean.

177. Polly Blankenship also has a granddaughter, age 8, who lives with her and who is exposed to this water when she bathes. Polly greatly worries about the longterm effects on her granddaughter's exposure to this water.

178. Polly Blankenship suffers great annoyance and inconvenience by not being able to use her tap water. When she turns her water on, she never knows what color it will be or whether it will be useable for the household tasks she has to use it for, like washing dishes, bathing, and laundry.

179. Polly Blankenship is entitled to compensatory damages from Taishan in an amount sufficient to reimburse her for these damages suffered.

180. Polly Blankenship is entitled to emergency, temporary, and permanent replacement water under WVSMCRA and common law principles because Taishan contaminated her drinking water.

***Lynn Combs***

181. Lynn Combs is a citizen of West Virginia, residing at 7 Rosebud Ave, Gary, WV 24836. Ms. Combs rents this residence.

182. Ms. Combs is a customer of and provided water by the City of Gary to her residence in Gary. That tap water is contaminated as a result of Taishan's mining operations.

183. Ms. Combs pays monthly water bills for water she cannot use. These bills frequently cost over $75 per month.

184. Because Ms. Combs cannot use her tap water for drinking or cooking, she regularly buys bottled water as a replacement. She uses roughly 4 to 6 gallons per day. She also uses bottled water to wash light-colored clothing. Ms. Combs is on a limited income, but must spend a quarter of her monthly income on just water (approximately $250 per month on water, plus money spent on gas to drive to Welch or Bluefield to buy the water).

185. Ms. Combs has to frequently replace her clothes because they become stained. Ms. Combs would not need to replace her clothing as frequently if her water was clean.

186. Ms. Combs suffers great annoyance and inconvenience by not being able to use her tap water.

187. Ms. Combs is entitled to compensatory damages from Taishan in an amount sufficient to reimburse her for these damages suffered.

188. Ms. Combs is entitled to emergency, temporary, and permanent replacement water under WVSMCRA and common law principles because Taishan contaminated her drinking water.

***Rosa Jenkins***

189. Rosa Jenkins is a citizen of West Virginia, residing at 100 Pinchback Aly, Gary, WV 24836.

190. Ms. Jenkins is a customer of and provided water by the City of Gary to her residence in Gary. That tap water is contaminated as a result of Taishan's mining operations.

191. Ms. Jenkins pays monthly water bills for water she cannot use. These bills frequently cost between $75 and $175 per month.

192. Because Ms. Jenkins cannot use her tap water for drinking or cooking, she drives to and hauls water back from Maybeury creek or buys it from the store. She also uses this water for showering, dishes, and laundry when possible or when the tap water is too bad to use for even those tasks.

193. Ms. Jenkins owns her residence and the property value of her residence is diminished as a result of her tap water's contamination. Her property would be worth more if the tap water at her house was not contaminated by Taishan.

194. Ms. Jenkins has to replace various appliances and common household goods more often than she would have to if her water were not contaminated. For instance, she had to replace her hot water heater because it was corroded from the contaminated water, at a cost of $900. She would not have had to replace her hot water heater this soon if her water was clean.

195. Sandra Blankenship similarly has to frequently replace her clothes because they become stained. She also takes her white clothing to the laundromat to avoid this staining. Ms. Jenkins would not need to replace her clothing as frequently or take her clothes to the laundromat if her water was clean.

196. Ms. Jenkins also has a daughter, age 16, that is exposed to this water. She does not drink it and relies on cases of bottled water that she gets from Sav a Lot or Goodson's stores.

197. Ms. Jenkins suffers great annoyance and inconvenience by not being able to use her tap water. She has to spend money every month on a water bill for water that she cannot use and more money on replacement water. It frustrates her to not be able to use the water from her tap.

198. Ms. Jenkins is entitled to compensatory damages from Taishan in an amount sufficient to reimburse her for these damages suffered.

199. Ms. Jenkins is entitled to emergency, temporary, and permanent replacement water under WVSMCRA and common law principles because Taishan contaminated her drinking water.

***Margo Hilton***

200. Margo Hilton is a citizen of West Virginia, residing at 47 Hanks St, Gary, WV 24836.

201. Ms. Hilton is a customer of and provided water by the City of Gary to her residence in Gary. That tap water is contaminated as a result of Taishan's mining operations.

202. Ms. Hilton pays monthly water bills for water she cannot use. These bills frequently cost over $75 per month.

203. Because Ms. Hilton cannot use her tap water for drinking or cooking, she regularly buys bottled water, and sometimes relies on community water distribution events. On average, she goes through a case of water each day for drinking and cooking. She has dogs and chickens, but relies on rain barrels for their water needs.

204. Ms. Hilton tries not to bathe in the water. She goes to her mom's house to bathe because her mom's water is filtered.

205. Ms. Hilton also tries to avoid washing her dishes with the water and relies on paper plates and forks frequently as a way to avoid the contaminated water touching her dishes.

206. Ms. Hilton owns her residence and the property value of her residence is diminished as a result of her tap water's contamination. Her property would be worth more if the tap water at her house was not contaminated by Taishan.

207. Ms. Hilton has to replace various appliances and common household goods more often than she would have to if her water were not contaminated. For instance, she has had to replace her washing machine because the water corroded it, her toilet and tub are stained, the

plumbing inside her house needs replaced, the hot water heater has been replaced and it needs a new element every 3 to 4 months, and she is unable to run water to her ice maker so it does not destroy it. Ms. Hilton would not incur these expenses as frequently if her water was clean.

208. Ms. Hilton similarly has to frequently replace her clothes because they become stained. Ms. Hilton avoids buying white clothes because they never stay white. She would not need to replace her clothing as frequently if her water was clean.

209. Ms. Hilton also has a granddaughter, age 14, who lives with her. She does not drink the water and also tries to shower elsewhere.

210. Ms. Hilton suffers great annoyance and inconvenience by not being able to use her tap water.

211. Ms. Hilton is entitled to compensatory damages from Taishan in an amount sufficient to reimburse her for these damages suffered.

212. Ms. Hilton is entitled to emergency, temporary, and permanent replacement water under WVSMCRA and common law principles because Taishan contaminated her drinking water.

***Jo Ann Day***

213. Jo Ann Day is a citizen of West Virginia, residing at 3747 Miracle Mountain Rd, Elbert, WV 24830.

214. Ms. Day is a customer of and provided water by the City of Gary to her residence in Elbert. That tap water is contaminated as a result of Taishan's mining operations.

215. Ms. Day pays monthly water bills for water she cannot use. These bills frequently cost over $70 per month.

216. Because Ms. Day cannot use her tap water for drinking or cooking, she regularly buys bottled water. She sometimes gets bottled water from church. She has also paid to have

someone install a water filter at her house, and regularly buys filters for that water (every 3 to 4 months they need changed). That filter does not make the water drinkable or clean enough to cook with.

217. Ms. Day owns her residence and the property value of her residence is diminished as a result of her tap water's contamination. Her property would be worth more if the tap water at her house was not contaminated by Taishan.

218. Ms. Day has to replace various appliances and common household goods more often than she would have to if her water were not contaminated. For instance, her dishwasher gets corroded and her sink, shower, and tub are stained. Ms. Day would not incur these expenses as frequently if her water was clean.

219. Ms. Day experiences some clothing staining, although it is not as bad as others, perhaps due to her water filters.

220. Ms. Day suffers great annoyance and inconvenience by not being able to use her tap water. Not being able to just turn on your faucet to brush your teeth or wash your face is extremely aggravating and causes extra work to make sure she has brought in enough water for her everyday needs.

221. Ms. Day is entitled to compensatory damages from Taishan in an amount sufficient to reimburse her for these damages suffered.

222. Ms. Day is entitled to emergency, temporary, and permanent replacement water under WVSMCRA and common law principles because Taishan contaminated her drinking water.

***Lois Clapsaddle***

223. Lois Clapsaddle is a citizen of West Virginia, residing at 3696 Miracle Mountain Rd, Elbert, WV 24830.

224. Ms. Clapsaddle is a customer of and provided water by the City of Gary to her residence in Elbert. That tap water is contaminated as a result of Taishan's mining operations.

225. Ms. Clapsaddle pays monthly water bills for water she cannot use. These bills frequently cost over $70 per month.

226. Because Ms. Clapsaddle cannot use her tap water for drinking or cooking, she collects or buys bottled water. She gets free water when she can, but she has to buy it when she cannot or it is not enough.

227. Ms. Clapsaddle is afraid of showering in the water, but she has no other choice but to do it.

228. Ms. Clapsaddle owns her residence and the property value of her residence is diminished as a result of her tap water's contamination. Her property would be worth more if the tap water at her house was not contaminated by Taishan.

229. Ms. Clapsaddle has to replace various appliances and common household goods more often than she would have to if her water were not contaminated. For instance, she just replaced the faucet in the tub because it was corroded, her hot water heater element needs replaced every 3 to 4 months, and her bathroom sink and tub are stained. She would not incur these expenses as frequently if her water was clean.

230. Ms. Clapsaddle similarly has to frequently replace her clothes because they become stained. She does not buy light-colored clothes because they will stain, and sometimes when the water is too brown, she just cannot wash her clothes. Ms. Clapsaddle would not need to replace her clothing as frequently if her water was clean.

231. Ms. Clapsaddle suffers great annoyance and inconvenience by not being able to use her tap water. She is aggravated when looking at the discolored water, how hard it is on her appliances, and that she has to shower in it.

232. Ms. Clapsaddle is entitled to compensatory damages from Taishan in an amount sufficient to reimburse her for these damages suffered.

233. Ms. Clapsaddle is entitled to emergency, temporary, and permanent replacement water under WVSMCRA and common law principles because Taishan contaminated her drinking water.

***Beverly Slagle***

234. Beverly Slagle is a citizen of West Virginia, residing at 196 Highland Ave, Gary, WV 24836.

235. Ms. Slagle is a customer of and provided water by the City of Gary to her residence in Gary. That tap water is contaminated as a result of Taishan's mining operations.

236. Ms. Slagle pays monthly water bills for water she cannot use. These bills frequently cost $70 per month.

237. Because Ms. Slagle cannot use her tap water for drinking or cooking, she relies on buying bottled water or driving to the nearby spring to fill up bottles of water.

238. Ms. Slagle owns her residence and the property value of her residence is diminished as a result of her tap water's contamination. Her property would be worth more if the tap water at her house was not contaminated by Taishan.

239. Ms. Slagle has to replace various appliances and common household goods more often than she would have to if her water were not contaminated. For instance, the contaminated

water ruins the hot water heater and she has to expend funds to fix it frequently. Ms. Slagle would not incur these expenses as frequently if her water was clean.

240. Ms. Slagle similarly has to frequently replace her clothes because they become stained. She would not need to replace her clothing as frequently if her water was clean.

241. Ms. Slagle also has grandchildren that are exposed to this water when they visit weekly.

242. Ms. Slagle suffers great annoyance and inconvenience by not being able to use her tap water. She should be able to take a shower in clean water, but she cannot even do that, which is extremely aggravating.

243. Ms. Slagle is entitled to compensatory damages from Taishan in an amount sufficient to reimburse her for these damages suffered.

244. Ms. Slagle is entitled to emergency, temporary, and permanent replacement water under WVSMCRA and common law principles because Taishan contaminated her drinking water.

***Christine Schrader***

245. Christine Schrader is a citizen of West Virginia, residing at 2612 Miracle Mountain Rd, Elbert, WV 24830.

246. Ms. Schrader is a customer of and provided water by the City of Gary to her residence in Elbert. That tap water is contaminated as a result of Taishan’s mining operations.

247. Ms. Schrader pays monthly water bills for water she cannot use. These bills frequently cost approximately $80 per month.

248. Because Ms. Schrader cannot use her tap water for drinking or cooking, she relies on buying bottled water every two weeks. She spends $30 to $50 per week on bottled water. She gets free water at the community distribution when she can but it is not enough to live off of.

249. Ms. Schrader owns her residence and the property value of her residence is diminished as a result of her tap water's contamination. Her property would be worth more if the tap water at her house was not contaminated by Taishan.

250. Ms. Schrader has to replace various appliances and common household goods more often than she would have to if her water were not contaminated. For instance, she has had to replace her hot water heater twice because of corrosion, and the water stains the toilet, sink, and tub. She has also had to replace her dishwasher because of corrosion. She would not incur these expenses as frequently if her water was clean.

251. Ms. Schrader similarly has to frequently replace her clothes because they become stained. New clothing becomes stained right away, which is frustrating. She would not need to replace her clothing as frequently if her water was clean.

252. Ms. Schrader also has two children in the home, ages 16 and 18, that are exposed to this water. She has them avoid drinking or swallowing it. She does not let her dog or cat drink the tap water either.

253. Ms. Schrader suffers great annoyance and inconvenience by not being able to use her tap water.

254. Ms. Schrader is entitled to compensatory damages from Taishan in an amount sufficient to reimburse her for these damages suffered.

255. Ms. Schrader is entitled to emergency, temporary, and permanent replacement water under WVSMCRA and common law principles because Taishan contaminated her drinking water.

***Rebecca Mullins***

256. Rebecca Mullins is a citizen of West Virginia, residing at 108 Lancelot Dr, Gary, WV 24836.

257. Ms. Mullins is a customer of and provided water by the City of Gary to her residence in Gary. That tap water is contaminated as a result of Taishan's mining operations.

258. Ms. Mullins pays monthly water bills for water she cannot use. These bills cost approximately $52 per month.

259. Because Ms. Mullins cannot use her tap water for drinking or cooking, she relies exclusively on bottled water. It is a constant process of procuring water and then using it, instead of just being able to turn the knob on her tap. Her animals (two dogs and birds) also rely on bottled water for drinking, along with her chickens, unless there is rainwater they can drink.

260. Ms. Mullins owns her residence and the property value of her residence is diminished as a result of her tap water's contamination. Her property would be worth more if the tap water at her house was not contaminated by Taishan.

261. Ms. Mullins has to replace various appliances and common household goods more often than she would have to if her water were not contaminated. For instance, her husband has to clean and/or replace the hot water heater element on a regular basis and the toilets, sinks, and tubs get stained by the water. She would not incur these expenses as frequently if her water was clean.

262. Ms. Mullins similarly has to frequently replace her clothes because they become stained. She would not need to replace her clothing as frequently if her water was clean.

263. Sandra Blankenship suffers great annoyance and inconvenience by not being able to use her tap water. She cannot even use her water to brush her teeth, which is very inconvenient.

264. Ms. Mullins is entitled to compensatory damages from Taishan in an amount sufficient to reimburse her for these damages suffered.

265. Ms. Mullins is entitled to emergency, temporary, and permanent replacement water under WVSMCRA and common law principles because Taishan contaminated her drinking water.

***Christine Gilliam and Lisa Gambill***

266. Christine Gilliam is a citizen of West Virginia, residing at 99 Oak Tree Lane, Gary, WV 24836, and owning 184 Turnhole Branch Road, Gary, WV 24836. Lisa Gambill is also a citizen of West Virginia and resides at 184 Turnhole Branch Road, the residence that Ms. Gilliam owns.

267. Ms. Gilliam and Ms. Gambill are both customers of and provided water by the City of Gary to their residences in Gary.[29] That tap water is contaminated as a result of Taishan's mining operations.

268. Ms. Gambill pays monthly water bills at 184 Turnhole Branch Road for water she cannot use.

269. Because Ms. Gilliam and Ms. Gambill cannot use their tap water for drinking or cooking, they rely on bottled water, getting it free from community distribution events when they can but inevitably buying water when the free water runs out. Ms. Gambill buys large packs of water (24-packs or larger) two or three times a week for drinking and cooking.

270. Ms. Gilliam owns 184 Turnhole Branch Road and the property value of that residence is diminished as a result of her tap water's contamination. Her property would be worth more if the tap water at her house was not contaminated by Taishan.

---

[29] Ms. Gilliam lives at The Oaks, a residential rental unit for the elderly. Her water bill is included in the price to rent this unit so while she does not pay a water bill for the water she uses at this residence, it is still nonetheless contaminated and unusable.

271. Ms. Gambill has to replace various appliances and common household goods more often than she would have to if her water were not contaminated. For instance, she has to replace the hot water heater element at least every six months and the water is hard on the washing machine. Ms. Gambill would not incur these expenses as frequently if her water was clean.

272. Ms. Gambill similarly has to frequently replace her clothes because they become stained and dingy. Ms. Gambill would not need to replace her clothing as frequently if her water was clean.

273. Ms. Gilliam and Ms. Gambill both suffer great annoyance and inconvenience by not being able to use their tap water. For instance, they both can barely shower in the water and it makes their skin develop rashes.

274. Ms. Gilliam and Ms. Gambill are entitled to compensatory damages from Taishan in an amount sufficient to reimburse her for these damages suffered.

275. Ms. Gilliam and Ms. Gambill are entitled to emergency, temporary, and permanent replacement water under WVSMCRA and common law principles because Taishan contaminated their drinking water.

**FIRST CAUSE OF ACTION**
***RCRA Open Dumping***

276. Plaintiffs hereby restate each and every preceding paragraph, as if specifically stated herein.

277. Taishan is violating the open dumping provision of RCRA. A civil action may be brought against "any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective" under RCRA. 42 U.S.C. § 6972(a)(1)(A). RCRA prohibits "any solid waste management practice or disposal of solid waste . . . which constitutes the open dumping of solid waste." *Id.* § 6945(a).

278. Taishan's operations at and around the Gary wellhouse constitute an open dump because (1) solid waste, (2) is disposed at that site, (3) that the site does not qualify as a landfill under § 6944, and (4) that the site does not qualify as a facility for the disposal of hazardous waste. *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1012 (11th Cir. 2004).

279. Taishan's coal refuse, or the dark gray or black materials in and around the City of Gary wellhouse, clearly fall within the statutory definition of "solid waste"—it is "refuse . . . resulting from . . . mining . . . activities." 42 U.S.C. § 6903(27). The PSC Report acknowledges this, identifying this black material as "coal refuse" repeatedly in its Report.

280. Taishan is "disposing" of its coal refuse at the wellhouse by discharging, depositing, dumping, spilling, and/or leaking those materials in, into, and around the City of Gary wellhouse. *See* 42 U.S.C. § 6903(3) (definition of disposal).

281. Taishan's site does not qualify as a sanitary landfill or hazardous waste facility (rather, it is a mining site).

282. Taishan's operations at and around the Gary wellhouse also constitute an open dump because it violates EPA regulations on open dumping, 40 C.F.R. pt. 257.

283. Taishan's operations violate 40 C.F.R. § 257.3-3(c), which state that "[a] facility or practice shall not cause non-point source pollution of waters of the United States that violates applicable legal requirements implementing an areawide or Statewide water quality management plan that has been approved by the Administrator under section 208 of the Clean Water Act, as amended." Taishan's own monitoring of the surface waters shows that Grapevine Branch has elevated levels of specific conductance, sulphates, iron, manganese, aluminum, TDS, and TSS. Taishan has a CWA permit but its own monitoring reports indicate that it has had no discharge for

over a year from its permitted outfalls. Thus, this contamination of Grapevine Branch must be from non-point source pollution.

284. Taishan's operations also violate 40 C.F.R. § 257.3-4(a), which provide that a "facility or practice shall not contaminate an underground drinking water source beyond the solid waste boundary." "Underground drinking water source" means an "aquifer supplying drinking water for human consumption." 40 C.F.R. § 257.3-4(c)(4)(i). The City of Gary's well at the wellhouse on Taishan's property supplies drinking water for over 400 households in the City, and it is contaminated such that all Gary residents cannot drink it or even use it to cook.

285. Finally, Taishan's operations violate 40 C.F.R. § 257.3-8(d), which explain that a "facility or practice shall not allow uncontrolled public access so as to expose the public to potential health and safety hazards at the disposal site." The area surrounding the wellhouse is close to a public road, is not fenced off, contains no "No Trespassing" signs, and thus allows anybody to be exposed to its solid waste and open dump site, which creates a potential health and safety hazard.

286. Plaintiffs are entitled to a declaration that Taishan is violating RCRA's prohibition on open dumping and an order compelling Taishan to remedy its open dumping.

## SECOND CAUSE OF ACTION
***Violation of WVSMCRA Performance Standards***

287. Plaintiffs hereby restate each and every preceding paragraph, as if specifically stated herein.

288. SMCRA provides authority for citizens to sue "any. . . person who is alleged to be in violation of any rule, regulation, order or permit." 30 U.S.C. § 1270(a)(1).

289. WVSCMRA mandates that all surface mining permits require the surface mining operation to "meet all applicable performance standards of this article and other requirements set

forth in legislative rules proposed by the director." W. Va. Code § 22-3-13(a). WVDEP's regulations issued under WVSCMRA similarly provide that "[t]he permittee shall comply with the terms and conditions of the permit, all applicable performance standards of [WVSCMRA], and this rule." W. Va. Code St. R. § 38-2-3.33.c. As such, all performance standards are incorporated as permit conditions for mining permits issued under WVSMCRA and failure to follow either the explicit permit condition or the performance standards violates WVSMCRA.

*Taishan's Failure to Protect the Hydrologic Balance*

290. As relevant here, the federal and state performance standards under SMCRA require all mining activities to be conducted in a manner that "minimize[s] disturbance of the hydrologic balance within the permit and adjacent areas" and "prevent[s] material damage to the hydrological balance outside the permit area." 30 C.F.R. § 816.41(a). Similarly, under WVSCMRA, surface mines must conduct operations, at a minimum, to "[m]inimize the disturbances to the prevailing hydrologic balance at the mine site and in associated off-site areas and to the quality and quantity of water in surface and groundwater systems both during and after surface mining operations and during reclamation." W. Va. Code § 22-3-13(b)(10); *see also* W. Va. Code St. R. § 38-2-14.5.

291. The Office of Surface Mining Reclamation and Enforcement ("OSMRE") confirmed that its regulations "require that surface coal mining and reclamation operations be planned and conducted so as to minimize disturbance to the prevailing hydrologic balance." 44 Fed. Reg. 14,902, at 15,142 (Mar. 13, 1979).

292. Hydrologic balance means "the relationship between the quality and quantity of water inflow to, water outflow from, and water storage in a hydrologic unit such as a drainage basin, aquifer, soil zone, lake, or reservoir. It encompasses the dynamic relationships among

precipitation, runoff, evaporation, and changes in ground and surface water storage." 30 C.F.R. § 701.5.

293. According to West Virginia regulations, "[m]aterial damage to the hydrologic balance outside the permit area means any long term or permanent change in the hydrologic balance caused by surface mining operation(s) which has a significant adverse impact on the capability of the affected water resource(s) to support existing conditions and uses." W. Va. Code St. R. § 38–2–3.22.e.

294. Taishan has severely disturbed the hydrologic balance within the permit area and/or materially damaged the hydrological balance outside its permit area since at least July 2024.

295. Inside its permit area, as explained in detail above in paragraphs 57 through 58 and Table 3, Taishan has high levels of specific conductance, TDS, iron, manganese, and sulfates in its groundwater at GW-1.

296. The groundwater in Taishan's permit area was not contaminated when a baseline hydrologic information was collected. This baseline data, as discussed in paragraphs 43 through 49, showed normal levels of these parameters, and the baseline data was collected after the site was thoroughly mined. According to federal SMCRA regulations, "[b]aseline hydrologic information required in §§ 780.21 and 780.22 of this chapter shall be used to determine the extent of the impact of mining upon ground water and surface water." 30 C.F.R. § 816.41(h).

297. Just as Taishan's GW-1 well is contaminated, so too is the Gary well, which is located on Taishan's property very close to GW-1, pulls from the same reservoir, and has been inundated with coal refuse. Thus, Taishan has diminished its own groundwater water quality *and* the Gary well's water quality, which is the sole drinking water source for residents in the City of Gary on the public water supply.

298. Plaintiffs and all others on the public water system cannot use their water because of Taishan's disturbance to the hydrologic balance—the water is not drinkable, nor is it suitable for bathing or even washing clothes because of the high levels of pollutants Taishan has let into the groundwater. That is certainly a significant adverse impact on the *capability* (and actuality) of the affected water to be used as a source for drinking water and for household tasks. *See* W. Va. Code St. R. § 38–2–3.22.e.

299. With regard to material damage to the hydrological balance outside the permit area, Taishan has caused material damage to the tap water of every Gary water customer, including Plaintiffs. While the *supply* of water is on Taishan's site, and it has been disturbed as described above, it is delivered offsite to Residents' homes. That is material damage offsite.

300. Taishan has also caused material damage to the hydrologic balance of *surface waters* outside its permit area. As its quarterly water quality monitoring reports show, and explained more fully in paragraphs 50 through 56, Taishan's operations are impairing Grapevine Branch and other nearby surface water with high levels of specific conductance, sulfates, iron, manganese, aluminum, TDS, and TSS. This contrasts with baseline water quality assessments which found the surface water near the site to be "good" and not adversely affected by the previously operating coal preparation plant. As explained above, high levels of these parameters impair aquatic life and thus have a significant adverse impact on the capability of Grapevine Branch and Tug Fork, into which it flows, to support aquatic life. This material damage is not attributable to its CWA discharges because there have been none into Grapevine Branch since 2024.

301. Taishan's disturbance and damage to the hydrologic balance, both onsite and offsite, is likely attributable to, among other things, its failure to follow W. Va. Code § 22-3-

12(b)(1)(E), which requires it to "clean[] out and remov[e] temporary or large settling ponds or other siltation structures after disturbed areas are revegetated and stabilized, and depositing the silt and debris at a site and in a manner approved by the secretary." *See also* 30 U.S.C.S. § 1265. As explained in detail above, Taishan has been cited by the WVDEP for years, and as recently as January 2026 for failure to maintain its ponds. Its coal refuse has escaped its ponds, has travelled downhill, and coats the Gary wellhouse and the area surrounding it. Taishan has also been cited for improper placement and reclamation of its pond cleanings both inside and outside of permit boundaries. This has caused or contributed to the disturbance and damage to the hydrologic balance onsite and offsite.

302. Additionally, as discussed in the Background section, according to Ms. Markham at the WV Department of Health, "the [Gary water] source is vulnerable to contamination from surface inflow from a coal mine refuse pond with improperly sealed wells, which is located immediately uphill of the system." Having improperly sealed wells violates W. Va. Code St. R. § 38–2–14.2a, which is geared towards protecting the hydrologic balance. That WVSMCRA regulation provides that "[e]ach . . . well . . . shall be sealed . . . to prevent acid or other toxic drainage from entering ground and surface waters, to minimize disturbance to the prevailing hydrologic balance[,] and to ensure the safety of people . . . [and] fish . . . in the permit and adjacent area." *Id.* § 38–2–14.2a. "Adjacent area" surely includes the Gary well *and* Plaintiffs' homes, as OSM has made clear that adjacent area should be interpreted broadly without a contiguous or spatial requirement. 44 Fed. Reg. at 14,923 ("A number of commenters recommended that 'adjacent area' be limited to 2,000 feet or 1/2 mile from the mine plan area or to locations which are contiguous to permit areas, so that permittees would not be held responsible for damages at long distances from the mine site. OSM rejected these suggestions, because the Act

does not authorize such limitations. The Act broadly requires protection of the environment, as discussed above in relation to the comments on the definition of 'mine plan area.'"). Thus, Taishan's improperly sealed wells are also attributable to its disturbance and damage to the hydrologic balance.

*Taishan's Failure to Prevent Damage to Off-Site Areas*

303. Taishan is also violating another WVSMCRA performance standard that requires it to "[p]rotect off-site areas from . . . damage occurring during surface mining operations and not deposit spoil material or locate any part of the operations or waste accumulations outside the permit area." W. Va. Code §22-3-13(b)(21).

304. As explained above, on January 21, 2026, WVDEP issued Taishan NOV 110 for failure "to protect offsite areas from surface mining activities in that permittee has placed pond cleanings off site in areas below pond 2 and by pond 14."

305. On April 1, 2026, WVDEP issued NOV 113 for failure to abate NOV 110 in a timely manner. In that NOV, WVDEP ordered Taishan to "[c]ease all mining related activity on the entire permit, except for work needed to abate NOV and to maintain water quality."

306. On June 2, 2026, WVDEP issued NOV 115 for failure to "control coal fines and dust coming off of the belt line structure at the load out area allowing it to leave the permit" area.

307. On July 12, 2026, WVDEP issued NOV 116 for "failure to maintain Pond #2 and pond #15 in that a hole has developed in the ponds causing water to exit before the approved spillways" and because "pond #15 has water going across the face coming off the access road." WVDEP ordered Taishan to stop the current leaks and prevent future leaks, and "to divert the water into pond #15 before the water reaches the face of the pond."

308. Upon information and belief, NOVs 110, 113, 115, and 116 remain unabated. Thus, Taishan is currently violating this performance standard by damaging off-site areas and has been since at least January 21, 2026.

309. Taishan has also been violating this performance standard since at least the middle of 2025 by allowing its coal refuse to surround and infiltrate the Gary wellhouse. The City of Gary has an easement to use that wellhouse, and Taishan has no right to mine there. Thus, the Gary wellhouse is off-site and Taishan causes off-site damage to it by allowing its spoil materials, including coal refuse and its constituents, to accumulate around the wellhouse and on the wellhouse floor, as seen in Figures 5 through 9 above, and to contaminate Gary's water supply and the Gary Resident's water.

310. Plaintiffsare entitled to a declaration that Taishan is violating WVSMCRA performance standards and an order compelling Taishan to immediately comply with its WVSMCRA permit.

**THIRD CAUSE OF ACTION**
***WVSMCRA Damages***

311. Plaintiffs hereby restate each and every preceding paragraph, as if specifically stated herein.

312. Under WVSCMRA, "[a]ny person or property who is injured through the violation by any operator of any rule, order or permit issued pursuant to this article may bring an action for damages, including reasonable attorney and expert witness fees, in any court of competent jurisdiction." W. Va. Code § 22-3-25(f).

313. WVSMCRA must be as stringent as the federal SMCRA program. The federal SMCRA program similarly provides that "[a]ny person who is injured in his person or property through the violation by any operator of any rule, regulation, order, or permit issued pursuant to

this chapter may bring an action for damages (including reasonable attorney and expert witness fees) only in the judicial district in which the surface coal mining operation complained of is located." 30 U.S.C. § 1270(f).

314. "Any person" should be interpreted broadly to include "[a]ny resident of the United States injured in any manner through failure of any operator" to comply with rules, regulations, or its permit conditions "may bring an action for damages in U.S. district court." 44 Fed. Reg. 14,902, 14,913 (Mar. 13, 1979) (citing H. Rep. No. 95-218). Indeed, Congress clearly intended "any person" to encompass it to include anyone who has standing under *Sierra Club v. Morton*, 405 U.S. 727 (1972). *Id.* at 14,913 (citing 119 Cong. Rec. 33190, S. Rep. No. 94-28).

315. "Damages" means "monetary compensation for an injury to a person or property." *McElroy Coal Co. v. Schoene*, 240 W. Va. 475, 490, 813 S.E.2d 128, 143 (2018) (citing Black's Law Dictionary 471 (10th ed. 2014) (defining "damages" as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury.")).

316. "[I]f a surface owner proves that his or her person or property was injured through a coal operator's violation of a rule, order, or permit, the surface owner can receive monetary compensation for such injury pursuant to West Virginia Code § 22-3-25(f)." *McElroy Coal Co. v. Schoene*, 240 W. Va. 475, 490, 813 S.E.2d 128, 143 (2018).

317. "[A] surface owner whose person or property is injured through a coal operator's proven violation of the Coal Mining Act may experience the loss of use of his or her property as a result thereof. In such an instance, a surface owner may be compensated for annoyance and inconvenience that is proven to have been caused by the loss of use of his or her property. In addition, West Virginia Code § 22-3-25(f) specifically refers to injury to a "person," which

certainly contemplates something beyond mere property repairs . . . ." *McElroy Coal Co. v. Schoene*, 240 W. Va. 475, 490, 813 S.E.2d 128, 143 (2018).

318. "In an action for damages for injury to the person or property as a result of the coal operator's violation of a rule, order, or permit under the Act, those damages can include compensation for annoyance and inconvenience caused by the loss of use of property resulting from a violation of the Act." *McElroy Coal Co. v. Schoene*, 240 W. Va. 475, 490, 813 S.E.2d 128, 143 (2018).

319. As explained in paragraphs 287 through 310 above, WVSCMRA mandates compliance with all applicable performance standards, and Taishan has violated various performance standards.

320. The injuries suffered by Plaintiffs are a result of Taishan's violation of WVSMCRA performance standards and permit conditions—but for Taishan's disturbance or material damage to the hydrologic balance and/or failure to prevent offsite damage, Plaintiff's water would not be contaminated.

321. As a result of Taishan's violation of WVSMCRA performance standards and permit conditions, Plaintiffs entitled to monetary compensation for the diminution of property value, damage to appliances, stained clothing, water bills, replacement water, and the annoyance and inconvenience caused by the loss of use of property resulting from Taishan's violation.

**FOURTH CAUSE OF ACTION**
***WVSMCRA Water Replacement***

322. Plaintiffs hereby restate each and every preceding paragraph, as if specifically stated herein.

323. Under WVSMCRA, a surface mine "operator shall replace the water supply of an owner of interest in real property who obtains all or part of the owner's supply of water for

domestic . . . use from an underground or surface source where the supply has been affected by contamination . . . proximately caused by the surface mining operation." W. Va. Code § 22-3-24(b).

324. WVSMCRA must be as stringent as the federal SMCRA program. The federal SMCRA program similarly provides that an operator "shall replace the water supply of an owner of interest in real property who obtains all or part of his supply of water for domestic, agricultural, industrial, or other legitimate use from an underground or surface source where such supply has been affected by contamination, diminution, or interruption proximately resulting from such surface coal mine operation." 30 U.S.C. § 1307(b).

325. Federal SMCRA regulations echo this requirement for water replacement and provide that "[b]aseline hydrologic information required in §§ 780.21 and 780.22 of this chapter shall be used to determine the extent of the impact of mining upon ground water and surface water." 30 C.F.R. § 816.41.

326. As explained in paragraphs 43 through 49 and 57 through 58 above, compared to the baseline hydrologic information in Taishan's permit, the current groundwater has far higher levels of the same pollutants and those levels exceed the standards for drinking water and aquatic life, as explained above. That is clearly damage to the hydrologic balance.

327. Damage of the hydrologic balance and water replacement are tied together—when the hydrologic balance is damaged, water replacement is required. *See* 44 Fed. Reg. at 15,175 (*see* § 816.54 Hydro[lo]gic balance: Water rights and replacement).

328. Indeed, OSMRE explained that "surface mining activities are to be performed in such a manner that water is not contaminated, interrupted, or diminished by the mining operations, and requires the replacement of domestic, agricultural, industrial, or other legitimate water supply

when impaired by the mining activities" and that authority for this came from Section 508(a)(13) of SMCRA. 44 Fed. Reg. at 15,175. That SMCRA section requires operators to have "a detailed description of the measures to be taken during the mining and reclamation process to assure the protection of: (A) the quality of surface and ground water systems, both on- and off-site, from adverse effects of the mining and reclamation process; (B) the rights of present users to such water; and (C) the quantity of surface and ground water systems, both on- and off-site, from adverse effects of the mining and reclamation process or to provide alternative sources of water where such protection of quantity cannot be assured." 30 U.S.C. § 1258(a)(13).

329. Water replacement is mandatory. While operators may prefer to pay financial compensation for the contamination of the water supply instead of providing a replacement water supply, OSMRE explicitly rejected it and found it was not sufficient or allowed under SMCRA. *See* 44 Fed. Reg. at 15,175 ("A commenter questioned whether the operator, in consultation with the owner of interest, should be provided with the option of either replacing water affected by contamination or compensating the owner of interest for that loss. It was asserted that this would be a less expensive method than physically supplying replacement water. If ruined waters are not replaced, owners of interest may never find potable water sources for the replacement on their own. Moreover, Sections 508(a)(13) and 717 of the Act require that replacement, not compensation, be provided."); *id.* ("(4) One commenter felt that the Section should be changed to provide that the operator would not have to replace the landowner's water supply, if the landowner indicated replacement was not wanted. The Office rejected this proposal, as Section 717(b) of the Act clearly requires replacement in all instances. Moreover, allowing present owners to waive the benefits of 816.54 would not provide adequate protection for present lessees or for future owners of the property involved.").

330. Taishan should have insurance sufficient to provide this water replacement. 44 Fed. Reg. at 15,119 ("Section 507(f) of the Act states that the insurance policy shall provide for property damage in an amount adequate to compensate any persons damaged as a result of surface coal mining and reclamation operations. Therefore, inclusion of damage to water wells as a specific example of the kind of liability intended to be covered by the policy has been retained.").

331. Plaintiffs are all owners of interest in real property because they own or rent their properties in Gary, West Virginia.

332. Plaintiffs obtain at least part of their supply of water for domestic use from an underground source of water, which is the Gary well.

333. The Gary well and the water is supplies to Plaintiffs has been affected by contamination—specifically iron, manganese, sulfates, and TDS contamination.

334. The contamination of their water supply was proximately caused by Taishan's operations at its permitted mine site—Taishan has operated its site in a manner that has allowed its coal refuse to surround and infiltrate the Gary wellhouse and its own groundwater monitoring results show that the groundwater on its site (which the Gary well also pulls from) is contaminated with the same pollutants.

335. Thus, pursuant to WVSMCRA, Taishan "shall: (1) Provide an emergency drinking water supply within twenty-four hours; (2) provide temporary water supply within seventy-two hours; (3) within thirty days begin activities to establish a permanent water supply or submit a proposal to the secretary outlining the measures and timetables to be utilized in establishing a permanent supply. . . . ; and (4) pay all reasonable costs incurred by the owner in securing a water supply." W. Va. Code § 22-3-24(d). Replacement of the water supply includes the "provision of

an equivalent water delivery system and payment of operation and maintenance cost in excess of customary and reasonable delivery cost for the replaced water supplies." W. Va. Code § 22-3-3(z).

336. Water replacement should be provided "[u]pon notification." *See Star Run, Inc. v. Commonwealth Env't & Pub. Prot. Cabinet*, 350 S.W.3d 1, 12-13 (Ky. Ct. App. 2010). In other words, notification starts the 24-hour, 72-hour, and 30-day clocks set out in W. Va. Code § 22-3-24(d) for water replacement.

337. Plaintiffs sent Taishan a demand for water replacement on June 3, 2026, and has still yet to receive emergency, temporary, or permanent water replacement in conformance with the statutory time periods described above.

338. Plaintiffs are entitled to an order compelling Taishan to provide them emergency, temporary, and permanent water replacement in conformance with WVSMCRA.

## FIFTH CAUSE OF ACTION
***Common Law Negligence***

339. Plaintiffs hereby restate each and every preceding paragraph, as if specifically stated herein.

340. WVSMCRA establishes that Taishan owes Plaintiffs a duty of care to "[m]inimize the disturbances to the prevailing hydrologic balance at the mine site and in associated off-site areas and to the quality and quantity of water in surface and groundwater systems both during and after surface mining operations and during reclamation." W. Va. Code § 22-3-13(b)(10); *see also* W. Va. Code St. R. § 38-2-14.5.

341. WVSMCRA also establishes that Taishan owes Plaintiffs a duty to "[p]rotect off-site areas from . . . damage occurring during surface mining operations and not deposit spoil material or locate any part of the operations or waste accumulations outside the permit area." W. Va. Code § 22-3-13(b)(21).

342. As explained in paragraphs 287 through 310, Taishan breached this duty by causing disturbance or material damage to the hydrologic balance and/or failing to prevent offsite damage, in violation of WVSMCRA.

343. "Violation of a statute is prima facie evidence of negligence. In order to be actionable, such violation must be the proximate cause of the plaintiff's injury." Syl. Pt. 2, *Waugh v. Traxler*, 186 W. Va. 355, 412 S.E.2d 756 (1991).

344. Taishan has otherwise negligently maintained its surface mine site by allowing its coal refuse to surround and infiltrate the Gary wellhouse, which it knows is the sole source of water for the City of Gary.

345. Taishan's breach of duty has caused harm to Plaintiffs by contaminating their water, rendering it undrinkable and unusable and forcing Plaintiffs to expend significant time and resources to find suitable water as a replacement and otherwise damaging Plaintiffs' property.

346. The harm to Plaintiffs and Plaintiffs' properties associated with Taishan's breach of its duty was entirely foreseeable—Taishan knew that the Gary well was located immediately downhill of its surface mine site and that its mine site shared the same aquifer as the City.

347. Plaintiffs are entitled to a declaration that Taishan's breach of its duty constitutes negligent action that is the proximate cause of Plaintiffs' injuries, to an injunction compelling water replacement as a remedy for such contamination and ongoing property devaluation, and/or to compensatory damages in an amount sufficient to reimburse Plaintiffs for the diminution of property value, damage to appliances, stained clothing, water bills, replacement water, and the annoyance and inconvenience caused by the loss of use of their water.

**SIXTH CAUSE OF ACTION**
***Tort of Outrage***

348. Plaintiffs hereby restate each and every preceding paragraph, as if specifically stated herein.

349. Recovery under the tort of outrage is permitted when "extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another . . . ." *Harless v. First Nat'l Bank*, 169 W. Va. 673, 703, 289 S.E.2d 692, 693 (1982).

350. To be successful on a tort of outrage claim, it must be shown:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Travis v. Alcon Laboratories, Inc.*, 202 W. Va. 369, 375, 504 S.E.2d 419, 425 (1998).

351. "Whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination." *Travis*, 202 W. Va. at 378, 504 S.E.2d at 428.

352. As the trier of fact, a jury takes "into account changing social conditions and plaintiff's own susceptibility [to determine] whether the particular conduct was sufficient to constitute extreme outrage." *Travis*, 202 W. Va. at 378, 504 S.E.2d at 428. "Whether a defendant has acted intentionally or recklessly in inflicting emotional distress is usually a question of fact for the jury." *Id.*

353. Taishan's actions or inactions that led to its coal refuse surrounding and infiltrating the Gary wellhouse, as described in paragraphs 70 through 76 and depicted in Figures 5 through 9, and subsequent contamination of Plaintiffs' tap water is atrocious, intolerable, and so extreme

that it exceeds the bounds of decency—Plaintiffs are unable to use the water that comes out of their tap.

354. Taishan acted recklessly and was, or should have been, substantially certain emotion distress to Plaintiffs and all other Gary residents would result from its contamination of the Gary wellhouse. Indeed, Taishan knew that the Gary well was the sole source of drinking water for Plaintiffs and residents, yet they allowed their coal refuse to surround and infiltrate it.

355. Because Taishan allowed its coal refuse to surround and infiltrate the Gary well, Taishan contaminated Plaintiffs' drinking water and thereby have caused them emotional distress. Indeed, it is hard to imagine what would be more distressing than not being able to drink, cook, or bathe with the water from your tap for a few days, let alone years.

356. No reasonable person could be expected to endure what Plaintiffs have endured—not being able to use or trust the water from their tap.

357. Plaintiffs are entitled to damages sufficient to compensate them for the emotional distress Taishan caused them and to injunctive relief in the form of water replacement to remedy the emotional distress they will continue to suffer from the inability to use their tap water due to Taishan's contamination of that water.

**REQUEST FOR RELIEF**

Plaintiffs respectfully request that the Court:

1. Declare that Taishan has violated and is in continuing violation of WVSMCRA and/or RCRA and otherwise operating its surface mine site negligently and outrageously;

2. Compel Taishan to issue an order to immediately comply with the terms and conditions of WVSCMRA permit O002084;

3. Award Plaintiffs damages pursuant to W. Va. Code § 22-3-25(f), 30 U.S.C. § 1270(f), common law negligence principles, and common law tort of outrage principles for Taishan's contamination of their water supply and subsequent damages to their property;

4. Declare that Taishan's failure to provide water replacement violates WVSMCRA, W. Va. Code § 22-3-24;

5. Compel Taishan to provide an emergency, temporary, and permanent water replacement supply pursuant to W. Va. Code § 22-3-24 and 30 U.S.C. § 1307(b);

6. Compel Taishan to provide water replacement as a remedy for its negligent and outrageous contamination of Plaintiffs' water;

7. Award Plaintiffs "all reasonable costs incurred by the owner in securing a water supply" before Taishan provides a replacement. W. Va. Code § 22-3-24(d).

8. Award Plaintiffs damages as a result of Taishan's negligent and outrageous conduct;

9. Enjoin Taishan from operating its site in such a manner as an open dump under RCRA;

10. Order Taishan to immediately remedy the underlying conditions that create the open dump under RCRA;

11. Award Plaintiffs' attorney's fees, expert witness fees, and all other reasonable costs and expenses incurred in the pursuit of this action; and

12. Grant Plaintiffs such other and further relief as is just and equitable under the circumstances.

Trial by jury is demanded for all causes of action so triable.

Dated: August 20, 2026 Respectfully submitted,

*/s/ Amanda P. Demmerle*

Amanda P. Demmerle (WVSB No. 13930)
Isak Howell (WVSB No. 11558)
Mike Becher (WVSB No. 10588)
Claire Horan (WVSB No. 14515)
APPALACHIAN MOUNTAIN ADVOCATES
P.O. Box 11571
Charleston, WV 25339
(757) 650-2774
ademmerle@appalmad.org
isak@howell-lawoffice.com
mbecher@appalmad.org
choran@appalmad.org

*Attorneys for Plaintiffs*